**Robert D. KRUMME, Plaintiff,**

v.

**WESTPOINT STEVENS INC., formerly known as West Point–Pepperell, Inc., Defendant.**

**Gordon E. Allen, et al., Plaintiffs,**

v.

**Westpoint Stevens Inc., formerly known as West Point–Pepperell, Inc., Defendant.**

**Nos. 89 Civ.2016 SAS JCF, 90 Civ. 3841 SAS JCF.**

United States District Court, S.D. New York.

Oct. 28, 1999.

298

Robert D. Krumme, Concord, MA, James Harbison, Jr., Morgan, Lewis &

Bockius LLP, New York, NY, for Plaintiff in Krumme, pro se.

Robert D. Krumme, Concord, MA, Robert A. Schwinger, Chadbourne & Parke LLP, New York, NY, Robert J. Hausen, New York, NY, for Plaintiffs in Allen.

Francis Carling, Collazo Carling & Mish LLP, New York, NY, Frederick Brodie, Johnita P. Due, Winthrop, Stimson, Putnam & Roberts, New York, NY, for Defendant.

## OPINION AND ORDER

SCHEINDLIN, District Judge.

For more than ten years, the parties in the above-captioned cases have been involved in litigation concerning the terms of an executive pension plan. During that time, the parties have briefed dozens of issues, conducted two trials before this Court and perfected two appeals to the Second Circuit. The instant dispute regarding the amount of attorneys' fees to be awarded represents the final battle in a long and hard-fought war.

In two previous opinions, I concluded that plaintiffs[1] were entitled to recover attorneys' fees and costs pursuant to a contractual provision in the disputed pension plan. *See Allen v. WestPoint–Pepperell, Inc.,* 933 F.Supp. 261, 269–70

(S.D.N.Y.1996); *Krumme v. West Point–Pepperell, Inc.,* 22 F.Supp.2d 177, 180 (S.D.N.Y.1998). I referred the calculation of the appropriate award of attorneys' fees and costs to Magistrate Judge James C. Francis, IV, who issued a Report and Recommendation on June 17, 1999 ("Report") and a Supplemental Report and Recommendation on June 30, 1999 ("Supplemental Report"). In July 1999, the parties submitted objections to the Magistrate's findings.

Pursuant to 28 U.S.C. § 636(b)(1)(C), this Court has conducted a de novo review of those portions of the Report and Supplemental Report to which the parties object. For the reasons that follow, I decline to adopt the Magistrate's findings with respect to capping the amount of recoverable attorneys' fees at one-third the amount in controversy, *see* Report 21–27; and (ii) declining to add contractual interest to an award of expert fees charged by the law firm of Skadden, Arps, Slate, Meagher & Flom ("Skadden"), *see* Supplemental Report at 2. In addition, I am modifying the Magistrate's decision with respect to plaintiffs' ability to recover expenses incurred to collect attorneys' fees. *See id.* at 19–21. I accept and adopt all of the remaining findings of the Magistrate's thorough and thoughtful Report and Supplemental Report.[2]

---

1. Unless otherwise indicated, "plaintiffs" refers collectively to plaintiffs in the *Krumme* and *Allen* cases.

2. I note that the time and effort expended in this "final battle" for attorneys' fees may be for nought. In 1997, defendant appealed this Court's decision in *Allen v. WestPoint–Pepperell, Inc.,* 933 F.Supp. 261 (S.D.N.Y.1996), to the Second Circuit. Among other things, defendant sought review of this Court's determination that plaintiffs were entitled to attorneys' fees. *See Krumme v. Westpoint Stevens Inc.,* 143 F.3d 71, 86 (2d Cir.1998). Defendant argued that if the Second Circuit "were to determine expeditiously that the district court's award of fees and costs to plaintiffs was error, [it] would prevent the needless expenditure of judicial resources." *Id.* Although the Second Circuit recognized "the serious practical considerations supporting

WestPoint's argument", it declined to review the issue of plaintiffs' entitlement to attorneys' fees. *Id.* Specifically, the Court of Appeals held that it had no jurisdiction under 28 U.S.C. § 1291 to review the issue because "[w]here attorney's fees and costs have been awarded, but not determined, the order is not final." *Id.* The Court of Appeals also declined to exercise pendent appellate jurisdiction over the issue stating that it had "rejected the doctrine of pendent appellate jurisdiction as a basis to review an undetermined award of attorney's fees, even when the question of liability for the fees had been consolidated with other decisions that were final." *Id.* at 87.

As a result, the parties, this Court and Magistrate Judge Francis have expended enormous amounts of precious time, energy and resources in determining the proper award of attorneys' fees in this case. If this Court's

## I. Background [3]

Robert Krumme, plaintiff in the *Krumme* case, and the nine individual plaintiffs in the *Allen* case (the *"Allen* plaintiffs") are former senior executives of Cluett, Peabody & Company ("Cluett"), an apparel manufacturer. In 1975, Cluett established an employee benefit plan for its senior executives known as the Executive Permanent Insurance Program ("EPI Program"). Defendant WestPoint Stevens, Inc. ("WestPoint") acquired Cluett in 1986 and operated the company as a wholly-owned subsidiary. In 1988, in an effort to protect the retirement benefits of EPI Program participants against a hostile takeover of the company, WestPoint offered participants an opportunity to subscribe to an amendment to the EPI Program ("EPI Amendment"). Pursuant to the EPI Amendment, in the event WestPoint experienced a "Change in Control", participants would receive a lump sum payment in an amount equal to the present value of their future stream of benefits. Krumme and the *Allen* plaintiffs all agreed to the Amendment.

As an additional measure of protection, the EPI Amendment also includes a provision which requires the company (Cluett/WestPoint) to compensate EPI Program participants for legal fees and costs expended in enforcing their rights under the plan after a change in control. Specifically, the attorneys' fees clause provides:

> If at any time upon or after a Change of Control there should arise any dispute as to the validity, interpretation or application of any term [or] condition of this Agreement ... Cluett agrees, upon

written demand by an Executive, to provide sums sufficient to pay on a current basis (either directly or by reimbursing the Executive or his legal representative) the Executive's costs and reasonable attorneys' fees (including expenses of investigation and disbursements for the fees and expenses of experts, etc.) ... incurred by the Executive in connection with any dispute or litigation, regardless of whether the Executive is the prevailing party, involving any provision of this Agreement, provided that the court in which such litigation is pursued determines, upon application of any party, that the Executive or his legal representative did not initiate frivolously such litigation.

EPI Amendment, Ex. A. to 1/22/99 Affidavit of Robert J. Hausen, Attorney for the *Allen* Plaintiffs ("Hausen Aff."), ¶ 16. Thus, under the EPI Amendment, WestPoint must compensate participants for legal expenses regardless of whether the participants prevail on their claims. And, not only is WestPoint required to compensate participants for attorneys' fees and costs, it is required to do so "on a current basis." The only conditions to payment of reasonable attorneys' fees under the clause are that (i) a change of control must have occurred; and (ii) the participant's claims must not be frivolous.

In 1989, WestPoint merged with a company called Farley, Inc. Immediately following the merger, WestPoint tendered to each of the plaintiffs—and to twenty-seven other EPI Program participants [4]—a lump sum payment of benefits discounted at an interest rate of 9.3%. It is this present

decision regarding liability for those fees is overturned on appeal then, true to the defendant's predictions, all of our efforts have been wasted.

**3.** Familiarity with this Court's prior opinions in the *Allen* and *Krumme* cases is presumed. The facts and lengthy procedural history surrounding both cases are set forth in those opinions as well as in *Krumme v. Westpoint Stevens Inc.,* 143 F.3d 71 (2d Cir.1998) and

the Magistrate's Report, *see* Report at 2–6. Accordingly, they are repeated only summarily here.

**4.** These twenty-seven other participants are plaintiffs in a related state court case entitled *Barefoot v. WestPoint–Pepperell.,* No. 129307/93 (Sup.Ct.N.Y.Co.). The relationship between the *Barefoot* case and the *Krumme* and *Allen* cases is discussed *infra* at Parts III.A.1. (b), III.A.3.

value discount rate that sparked a decade of litigation. Krumme and the *Allen* plaintiffs believed that a lower discount rate of 5% should have been used to calculate their lump sum payments, while WestPoint maintained that 9.3% was the proper figure. Krumme filed his complaint in 1989, and the *Allen* plaintiffs filed their complaint in 1990. The merits of both cases were vigorously litigated until May 1998 when the Second Circuit held that 9.3% was, in fact, the appropriate discount rate. *See Krumme*, 143 F.3d at 84–86 (reversing district court's finding that 5% was the appropriate discount rate).

Following the Second Circuit's decision on the merits, this Court affirmed its prior holding that both Krumme and the *Allen* plaintiffs were entitled to attorneys' fees under the EPI Amendment and referred the case to Magistrate Judge Francis for calculation of the proper award.[5] *See Krumme*, 22 F.Supp.2d at 180.

## II. Magistrate's Report

The *Krumme* case was litigated both by Krumme, acting pro se, and by the law firm of Morgan, Lewis & Bockius LLP ("Morgan Lewis"). The *Allen* plaintiffs were represented during the litigation by Krumme and by the law firm of Chadbourne & Park ("Chadbourne"). Krumme and the *Allen* plaintiffs have requested an award of attorneys' fees based on their counsels' billable hours multiplied by an hourly rate plus costs and contractual interest. Their original fee applications are summarized in the following chart:

### PLAINTIFFS' FEE APPLICATIONS

| CASE | COUNSEL | FEES | COSTS | INTEREST | TOTAL |
|------|---------|------|-------|----------|-------|
| Krumme | Krumme | $151,688 | $814 | $245,259 | $397,761 |
| | Morgan Lewis | $854,439 | $53,791 | $786,748 | $1,694,978 |
| Allen | Krumme | $399,825 | $5,830 | $192,682 | $598,337 |
| | Chadbourne | $1,879,624 | $138,484 | $965,652 | $2,983,760 |

*See* Report at 9.

Rather than awarding attorneys' fees based on billable hours as requested by Krumme and the *Allen* plaintiffs, *see* "fees" column above, the Magistrate determined the total amount in controversy in each case, and he awarded counsel an aggregate of one-third of the amount in controversy in their respective cases.[6] *See id.* at 21–27. The Magistrate also reduced Morgan Lewis's and Chadbourne's requested costs based on his findings that the firms' rates for in-house photocopying were inflated compared with the rates of outside vendors and that certain costs that were routinely included in the firms' operating budgets should not have been charged to the *Krumme* and *Allen* clients. *See id.* at 27–29. Finally, the Magistrate awarded contractual interest on the allowed fees and costs by determining the ratio of interest requested as a percentage of the fees and costs requested and applying that ratio to the fees and costs actually awarded. *See id.* at 29–33. The Magistrate declined to compensate plaintiffs for expenses incurred to collect attorneys' fees. The Magistrate's award of attor-

---

**5.** This Court had previously determined that both conditions to recovery of legal expenses under the EPI Amendment had been met: (i) a change of control occurred when Farley Inc. acquired WestPoint; and (ii) plaintiffs' claims against WestPoint were not frivolous. *See Allen*, 933 F.Supp. 261, 269–70.

**6.** The Magistrate then allocated the fees among counsel by dividing the fee awards in each case in proportion to each attorney's fee application. *See id.* at 27.

neys' fees and costs is summarized in the following chart:

### MAGISTRATE'S FEE AWARD

| CASE | COUNSEL | FEES | COSTS | INTEREST | TOTAL |
|------|---------|------|-------|----------|-------|
| Krumme | Krumme | $34,839 | $814 | $57,401 | $93,054 |
| | Morgan Lewis | $195,881 | $46,660 | $211,011 | $453,552 |
| Allen | Krumme | $164,266 | $5,830 | $79,945 | $250,041 |
| | Chadbourne | $774,394 | $91,583 | $415,669 | $1,281,646 |

*See id.* at 33.

In his Supplemental Report, the Magistrate awarded Krumme an additional $9,359 in costs for expert fees charged by Skadden in May 1996. *See* Supplemental Report at 1–2. However, the Magistrate declined to add contractual interest to that amount. *See id.*

### III. Objections to the Report

As set forth above, both parties object to various portions of the Magistrate's Report. Defendant objects to the Magistrate's award of (i) attorneys' fees to the *Allen* plaintiffs; (ii) contractual interest to plaintiffs in both cases; and (iii) attorneys' fees to Krumme for his pro se work. *See* WestPoint Stevens Inc.'s Objections to the Report and Recommendation of Chief Magistrate Judge James C. Francis, IV ("WestPoint Obj."). I find that defendant's objections to these awards of fees and interest are without merit for the reasons set forth in the Report. *See* Report at 11–16; 18–19; 29–32.

Plaintiffs' objections to the Report are more persuasive. Plaintiffs' main contention is that the Magistrate erred in capping attorneys' fees at one-third the amount in controversy. *See* [Krumme's] Objections to Certain Parts of the Magistrate Judge's Report and Recommendation for Attorney's Fee Awards ("Krumme Obj.") at 4–14; [*Allen* Plaintiffs'] Objection to Report and Recommendation ("Allen Obj.") at 8–16. Plaintiffs also assert that under the circumstances of the instant case they should be allowed to recover expenses incurred to collect attorneys' fees. *See* Krumme Obj. at 15–17; Allen Obj. at 19–20. Plaintiffs' arguments are discussed in turn below.[7]

### A. Cap on Attorneys' Fees

Under New York law, there is no single formula for the calculation of reasonable attorneys' fees.[8] Whether a fee request is appropriate depends upon the circumstances surrounding a particular case and an evaluation of the following factors: "the difficulty of the questions involved; the skill required to handle the problem; the time and labor required; the lawyer's experience, ability and reputation; the customary fee charged by the Bar for similar services; and the amount involved." *Beary v. Verbel (In re Schaich),* 55 A.D.2d 914, 391 N.Y.S.2d 135, 136 (2d Dep't 1977).

In analyzing the appropriate award of attorneys' fees in *Krumme* and *Allen,* the Magistrate considered only one of the factors listed above, namely the amount involved in the litigation. Citing *Diamond D Enterprises USA, Inc. v. Steinsvaag,* 979 F.2d 14 (2d Cir.1992), the Magistrate found that "[f]ees in excess of the amount

---

7. Plaintiffs do not object to the Magistrate's reduction of Morgan Lewis's and Chadbourne's costs. *See* Krumme Obj. at 2 n.1; Allen Obj. at 6 n.2.

8. The parties agree that New York law governs the terms of the EPI Amendment's attorneys' fees provision.

involved in the litigation are presumptively unreasonable." Report at 21 (citing *Diamond D*, 979 F.2d at 19). The Magistrate also set forth the additional criterion that "the fee award should be 'reasonably related to the fee arrangement that the prevailing party would have made with counsel absent a fee-shifting agreement.'" *Id.* at 22 (quoting *In Time Prods. Ltd. v. Toy Biz, Inc.*, 38 F.3d 660, 667 (2d Cir.1994)).

Relying on the above-quoted language from *Diamond D* and *In Time Prods.*, the Magistrate concluded that regardless of the amount of time and effort actually expended by plaintiffs' counsel, plaintiffs were only entitled to attorneys' fees in an amount less than the total amount in controversy in their respective cases. *See id.* at 25–27. The Magistrate also concluded that in the absence of a contractual attorneys' fee provision, both Krumme and the *Allen* plaintiffs would have entered into a one-third contingency arrangement with their counsel:

> Since it is highly unlikely that the plaintiffs would have agreed to pay their attorneys more than one-third of their maximum recoveries (or to pay them on a straight hourly basis) in the absence of the contractual fee-shifting provision, their fee award must be limited to those amounts.

*Id.* at 25.[9] Accordingly, the Magistrate determined what he considered to be the "amount in controversy" in each case, *see infra* Part III.A.3, and he capped the aggregate attorneys' fees in each case at one-third that amount. *See* Report 25–27. If adopted, the Magistrate's cap would effectively reduce the amount of requested at-

torneys' fees in the *Krumme* and *Allen* cases by 77% and 59% respectively.

Plaintiffs claim that the Magistrate erred in capping their recovery of attorneys' fees at one-third the amount in controversy. I agree for several reasons. *First,* due to the unique nature of the EPI Amendment's provision for legal expenses ("EPI fee provision"), the "amount in controversy" is not a meaningful or necessary gauge of reasonableness. *Second,* consideration of the arrangement plaintiffs would have made with counsel absent the EPI fee provision is similarly inapplicable in the instant case. *Third,* even assuming that the "amount in controversy" were a requisite factor, a cap on fees is still inappropriate because the true "amount in controversy" exceeds plaintiffs' requested fee awards.

### 1. "Amount in Controversy" is Not A Bright–Line Rule

The Magistrate treated the general rule that reasonable attorneys' fees should not exceed the amount in controversy as a per se bar to plaintiffs' recovery of their requested fees. That is, once the Magistrate determined that the requested fee applications were greater than the amount in controversy, he radically reduced plaintiffs' fee requests without considering any of the other factors of reasonableness listed above. Such a result was not compelled by either the cases the Magistrate relied upon or by New York law.

To begin, the three Second Circuit cases cited by the Magistrate make clear that there is no bright-line rule—even with re-

---

9. Indeed, the Magistrate assumes in his Report that the *Allen* plaintiffs did, in fact, enter into a one-third contingency arrangement with their counsel. *See* Report at 25 (stating that "counsel in the *Allen* case entered into a one-third contingency arrangement with their clients"). Such an assumption, however, mischaracterizes the terms of the *Allen* plaintiffs' retainer agreement. The *Allen* plaintiffs entered into a two-part alternative retainer agreement with Krumme and Chadbourne. *See* 1/15/99 Affidavit of Robert D. Krumme in

Support of Application for Contractual Costs and Attorney's Fees in *Allen* and Joint Actions ("Krumme Aff."), attached to 1/15/99 letter from Krumme to Judge Francis, at 2–4; Allen Obj. at 11 n.4. In the event of a substantial recovery, the *Allen* plaintiffs agreed to pay counsel one-third of the amount recovered. *See* Krumme Aff. at 2–4. In the event their recovery was not substantial, the *Allen* plaintiffs agreed to pay counsel on an hourly basis in reliance on the attorneys' fees provision of the EPI Amendment. *See id.*

gard to the amount in controversy—for the calculation of reasonable attorneys' fees. *See In Time,* 38 F.3d at 667–68; *Diamond D,* 979 F.2d at 20; *F.H. Krear & Co. v. Nineteen Named Trustees,* 810 F.2d 1250, 1263–64 (2d Cir.1987). For example, although the court in *Diamond D* found that the amount in controversy in the litigation "is generally the ceiling on the fees that may be awarded pursuant to a fee-shifting clause", it went on to conclude that "[t]his is only a rule of thumb.... It is a starting point in the process of ultimately determining whether a fee award is reasonable." *Diamond D,* 979 F.2d at 19–20 (emphasis added). Similarly, *F.H. Krear* refers to the *"general* rule in New York, i.e., that it is *rarely* proper to award fees in an amount that exceeds the amount involved in the litigation." *Krear,* 810 F.2d at 1250 (emphasis added).

More important, however, is that the New York case law upon which the Second Circuit relied in *F.H. Krear* and *Diamond D* explicitly states that there are circumstances where reasonable attorneys' fees can exceed the amount in controversy. *See Simmons v. Government Employees Ins. Co. (In re Simmons),* 59 A.D.2d 468, 400 N.Y.S.2d 99 (2d Dep't 1977) (cited in *F.H. Krear* and *Diamond D* for proposition that under New York law an award of fees in excess of amount in controversy is generally unreasonable); *Colon v. Automatic Retailers Assoc. Serv. Inc.,* 74 Misc.2d 478, 343 N.Y.S.2d 874 (Civ.Ct. N.Y.Co.1972), *rev'd on other grounds,* 74 Misc.2d 665, 347 N.Y.S.2d 312 (App.Term 1st Dep't 1973) (same).

For example, in *Colon,* the seminal New York case with respect to the "amount in controversy" rule, defendant British Overseas Airways Corporation ("BOAC") sought reimbursement for attorneys' fees from its co-defendant pursuant to an indemnification clause. 74 Misc.2d 478, 343 N.Y.S.2d 874. BOAC requested an award of $10,236.54 based on hours expended times an hourly rate. *Id.* at 882. In evaluating the reasonableness of BOAC's

requested fees, the court found that "the amount of time expended considering the complexities involved in [the] case was fair and reasonable.... In the court's opinion, subtle and complex questions of law and fact were skillfully analyzed, researched and briefed by BOAC's lawyers." *Id.* With respect to the amount involved in the litigation, however, the court's jurisdiction was limited to $10,000, and thus the requested fee exceeded the amount in controversy. *Id.* Although the court recognized the general rule that "[a] fee in excess of the amount involved in a litigation would normally appear to be unreasonable", *id.* at 883, it concluded that there were circumstances where this general rule was inapplicable:

> Every gentleman of the Bar well knows that there cannot be any one rule of charges in the nature of a horizontal tariff on all cases.
>
> Every lawyer knows that there are some cases where the fee must be greater than the amount of money involved in the litigation. True, these are the exceptions to the rule. An action to recover a small disability payment under a disability insurance policy, an action to recover rent or other payment under a lease which would be determinative of the validity of the policy are two exceptions which come to mind. There are other cases where there are transcending principles involved which make it economically feasible and reasonable that a fee be paid in excess of the amount involved in the litigation.

*Id.* (internal quotations omitted). In *Colon,* the court found that "transcending principles" were involved in the litigation because in defending the action, BOAC and its co-defendant raised and resolved issues regarding their indemnification agreement that would benefit both BOAC and its co-defendant in the future. *Id.* As a result, the court concluded that BOAC should receive its full request for attor-

neys' fees regardless of the amount in controversy.[10]

█ Like the *Colon* case, the *Krumme* and *Allen* cases involve circumstances which warrant an exception from the general rule regarding fees in excess of the amount in controversy. As discussed below, the unique nature of the EPI fee provision together with the policy reasons underlying the provision render consideration of the amount in controversy inappropriate. Moreover, both cases involve "transcending principles" that further justify a fee award in excess of the amount involved in the litigation.

### (a) EPI Fee Provision

*F.H. Krear, Diamond D* and *In Time Prods*, all involved requests for attorneys' fees pursuant to classic "fee-shifting" clauses. A fee-shifting clause provides "that in the event of litigation[,] the *losing* party will pay the attorneys' fees of the prevailing party." *F.H. Krear*, 810 F.2d at 1263 (emphasis added). The term "fee-shift" is descriptive. That is, once a party prevails in the litigation, his or her responsibility for payment of attorneys' fees literally "shifts" to the other party.

In contrast, the EPI fee provision is not a classic fee-shifting clause. Indeed, it is technically not a fee-shifting clause at all because responsibility for payment of attorneys' fees never shifts; it begins and ends with WestPoint regardless of who wins the litigation. Rather than a fee-shift, the EPI fee provision is a contract between WestPoint and the plan participants pursuant to which WestPoint agreed to provide costs and attorneys' fees to participants "for any dispute" concerning the EPI Program, "regardless of whether the participant is the prevailing party."

EPI Amendment, Ex. A to Hausen Aff., ¶ 16. In addition, WestPoint agreed to pay those costs, not at the end of the litigation, but on a current basis.

The purpose behind such a broad provision for attorneys' fees was clearly to allow individual plan participants to enforce their rights under the plan against the company in the event of a hostile takeover or other "change in control". *See Allen*, 933 F.Supp. at 269. Providing funding on a current basis ensures that participants can retain effective counsel and pursue litigation on a "level playing field" against a large corporation with immeasurably greater resources. It also ensures that regardless of the monetary value of an individual participant's claim, as long as that claim is not frivolous, he or she can seek full redress. To now limit or cap the amount of attorneys' fees plaintiffs can recover to a percentage of the amount in controversy would undermine the purpose of the contract provision.

Although this Court was unable to find any case law construing a private contractual fee arrangement of similar breadth and purpose as the EPI fee provision, an analogy can be drawn between the EPI provision and fee-shifting statutes in civil rights litigation. For example, in *Quaratino v. Tiffany & Co.*, 166 F.3d 422 (2d Cir.1999), a prevailing Title VII plaintiff sought $139,022 as reasonable attorneys' fees pursuant to Title VII's fee-shifting clause. The district court conducted a "lodestar analysis"[11] evaluating the attorney's hourly rate and the time expended and determined that an award of $124,645 was appropriate. *See id.* at 425. However, the district court declined to award the lodestar amount and instead recalculated

---

10. Similarly, in *Simmons*, the court awarded plaintiff $2,149 in attorneys' fees even though the underlying claim was worth only $105 because it concluded that there were "transcending principles" that warranted an exception to the general rule that fees should not exceed the amount in controversy. 59 A.D.2d 468, 400 N.Y.S.2d 99.

11. Under a "lodestar" analysis " 'the hours reasonably spent by counsel, as determined by the Court, [are] multiplied by the reasonable hourly rate.' " *F.H. Krear*, 810 F.2d at 1263 (quoting *Zauderer v. Barcellona*, 130 Misc.2d 234, 495 N.Y.S.2d 881 (N.Y.Civ.Ct. 1985) (alteration in original)).

the award using a "billing judgment approach." *See id.* Under the billing judgment approach

> an attorney's requested fee would be judged "reasonable" if it were rationally related to the monetary recovery that the attorney could have anticipated ex ante. The district court would have had [plaintiff's] attorney estimate ex ante the total possible financial recovery in the case ... discount that amount for the "substantial" risk of no recovery, and proceed to expend time on the case only up to the time value of an appropriate fraction of that expected recovery.

*Id.* at 425–26 (citation omitted). Using the billing judgment approach, the district court awarded plaintiff attorneys' fees in an amount equal to one-half of plaintiff's trial recovery of $158,145 or $79,072. *Id.* at 425.

In reviewing the district court's decision, the Second Circuit found that not only did it have "considerable misgivings as to the feasibility of such precise ex ante calculations" but that the approach "conflicts with the legislative intent and rationales of the fee-shifting statute." *Id.* at 426. According to the Second Circuit:

> Congress enacted fee-shifting in civil rights litigation precisely because the expected monetary recovery in many cases was too small to attract effective legal representation. Were we to adopt the "billing judgment" approach that the district court advocates we would contravene that clear legislative intent by relinking the effectiveness of a civil rights plaintiff's legal representation solely on the dollar value of her claim.

*Id.* at 426 (citation omitted). The Second Circuit vacated the district court's award and remanded the case for further analysis using the lodestar approach.

Obviously, EPI plan participants were not litigating their civil rights. However, they were litigating their rights under an employee benefits plan. Moreover, like Congress, WestPoint evidenced a clear intent to allow plaintiffs "to attract effective legal representation" regardless of the monetary amount of their claim. Just as the *Quaratino* Court found that the business judgment rule would contravene Congress's intent in enacting the statute, so too would the Magistrate's cap—which is in essence a business judgment approach—undermine the purposes of the EPI fee provision.

Not only would a cap on fees undermine the purpose of the EPI fee provision, it would also deprive plaintiffs of the benefit of their bargain. Plaintiffs signed the EPI Amendment relying in part on the provision for attorneys' fees. WestPoint agreed to fund litigation of any nonfrivolous claim; it never tied its obligation to the expected amount of recovery for those claims. And plaintiffs have, in fact, relied on the terms of the fee provision in pursuing litigation for the past ten years. To now cap plaintiffs' recovery at a percentage of the amount in controversy would unjustly penalize them for their reasonable reliance on the plain language of their contract with WestPoint.

Finally, there is no unfairness to West-Point in enforcing the EPI fee provision to its full extent. WestPoint is a sophisticated corporation with experience in drafting and entering into contracts. The company had access to both in-house and outside counsel and likely drafted the EPI Amendment—including its extremely broad fee provision—with the benefit of legal advice. In addition, that a plan participant might in the event of litigation incur legal costs in excess of their individual claims was not only foreseeable, it was, as explained above, the purpose behind the provision for attorneys' fees. In other words, rather than craft a fee provision which reduced or capped attorneys' fees in the foreseeable and likely event that litigation expenses exceeded the amount in controversy, West-Point instead offered plaintiffs an extremely broad fee provision which is not conditioned on either the amount or success of plaintiffs' claims.

Similarly, the unconditional nature of the EPI fee provision eliminates the uncertainty and resulting unfairness typically associated with classic fee-shift provisions where neither party knows whether they will be responsible for legal costs until the litigation ends and one party prevails. Under the EPI fee provision, WestPoint knew from the time Krumme and the *Allen* plaintiffs filed their complaints that it was responsible for plaintiffs' legal expenses. Therefore, as the litigation proceeded through its various stages, WestPoint was itself in a position to assess whether pursuing litigation was reasonable in light of its obligation to pay both plaintiffs' and its own legal bills. Indeed, had WestPoint compensated plaintiffs on a "current basis" as per its obligation under the EPI fee provision, it would have been able to track plaintiffs' litigation expenditures exactly. There is simply no escaping the fact that WestPoint was in the driver's seat with respect to litigation costs. WestPoint had both the incentive and the ability to end the litigation when it no longer made economic sense to pursue its defense of plaintiffs' claims.[12] If WestPoint determined that its combined litigation costs were too great, then it could have and should have settled or otherwise disposed of the litigation. That WestPoint continued to vigorously defend itself against plaintiffs' claims gives rise to a strong presumption that defendant found it economically rational to proceed. That presumption is supported by consideration of the parallel state court litigation to which I now turn.

### (b) Transcending Principles

In addition to the unique nature of the EPI fee provision which in and of itself warrants an exception to the amount in controversy rule, there are transcending principles which further justify an award of fees in excess of the amount of the underlying claim. As set forth above, in addition to Krumme and the nine *Allen* plaintiffs, twenty-seven former senior executives of Cluett received lump sum payments calculated at a discount rate of 9.3% upon WestPoint's merger with Farely Inc. These twenty-seven executives, who are also represented by Krumme and Chadbourne, could not bring a diversity action in federal court because they lacked either diversity or the requisite jurisdictional amount. *See Barefoot v. West Point–Pepperell*, 129307/93, slip. op. at 6 (Sup.Ct. N.Y.Co., Sept. 19, 1994). Because all of the plan participants could not bring a single action in federal court, they decided to bring a test case comprised of nine plan participants—the *Allen* plaintiffs—in the Southern District of New York where the *Krumme* case had been underway for more than a year. *See* Allen Obj. at 11. In 1993, fearful that their claims would be time-barred, the twenty-seven executives filed an action in New York State Court. *Id.*

**12.** Put somewhat differently, the danger with a typical fee-shifting arrangement such as the provisions at issue in *F.H. Krear, Diamond D* and *In Time Prods.*, is that neither party is ultimately responsible for ensuring that litigation costs do not exceed the amount in controversy. Absent a fee-shift, each party must continuously engage in cost-benefit analyses to determine whether the expense of pursuing litigation makes economic sense in light of the total amount that the party could potentially recover or potentially lose. Where the costs exceed the perceived benefits, a rational party responsible for payment of its own fees will seek to end the litigation. In contrast, under a fee-shift agreement where there is a fifty percent chance that a party will not have to pay its litigation costs, parties do not have the same incentive to ensure that litigation costs are commensurate with the amount in controversy. Nor do they have an incentive to structure fee arrangements with counsel that are appropriate under the circumstances.

Unlike a classic fee-shift, however, the unconditional nature of the EPI provision rests responsibility for ensuring that litigation costs do not exceed the amount in controversy solely with WestPoint. Thus, the economic dynamics in the instant case mirror those of a litigation in which each party is responsible for its own legal fees. And, because WestPoint did not end the litigation or curb its defense of plaintiffs' claims, it must be assumed that WestPoint found it economically beneficial to proceed.

The gravamen of the state court action is identical to the federal court action. Like Krumme and the *Allen* plaintiffs, the *Barefoot* plaintiffs allege that "the lump sum payout should have been calculated on the basis of a 5% discount rate rather than the 9.3% discount rate used by defendants." *Barefoot*, 129307/93, slip. op. at 3. In fact, defendant has conceded that the *Barefoot* complaint "is 'essentially identical' to the complaint in the *Allen* case." *Id.* at 4.

The similarity between the federal and state court actions is significant because "[t]he doctrine of collateral estoppel precludes a party from relitigating an issue which has previously been decided against him in a proceeding in which he had a fair opportunity to fully litigate the point." *Kaufman v. Eli Lilly & Co.*, 65 N.Y.2d 449, 455, 492 N.Y.S.2d 584, 482 N.E.2d 63 (1985) (internal quotations omitted). Because of the similarity between the *Krumme*, *Allen* and *Barefoot* actions, it is almost certain that the resolution of the federal action in favor of WestPoint will bar the *Barefoot* plaintiffs from relitigating the issue of the proper discount rate and the validity of their releases in state court.[13] Thus, there is no question that the issues underlying the *Krumme* and *Allen* litigation "transcend" those cases. Every issue that was fully litigated and resolved in the federal cases had, and will continue to have, a direct and immediate effect on the parties in the *Barefoot* case. Accordingly, it was economically feasible and reasonable for the parties in *Allen* and *Krumme* to pursue each issue vigorously, even where such pursuit ultimately raised legal costs above the amount in controversy in those cases. *See, e.g., National Union Fire Ins. Co. of Pittsburgh v. Hartel*, 782 F.Supp. 22

(S.D.N.Y.), *aff'd*, 972 F.2d 1328 (2d Cir. 1992) (awarding attorneys' fees in excess of amount in controversy because "favorable precedent established will benefit [plaintiff insurance company] if the issue is raised by other defendants, and it will reduce or eliminate [plaintiff's] potential liability."); *see also F.H. Krear*, 810 F.2d at 1264 (citing *Colon* for the proposition that exceptions may be made to the general amount in controversy rule "where the court finds that the benefits of the litigation reached far beyond the amount sought in the immediate suit").

Defendant argues that the rulings in the federal litigation conferred no "benefit" on the *Barefoot* plaintiffs because those rulings were ultimately adverse to the state plaintiffs' interests. *See* WestPoint Stevens Inc.'s Consolidated Memorandum in Response to Plaintiffs' Objections to the Report and Recommendation of Chief Magistrate Judge James C. Frances, IV ("Westpoint Resp. Obj.") at 6–8. Defendant's argument misses the point of the transcending principles exception. Whether the *Barefoot* plaintiffs or WestPoint finally prevail in the state court action is irrelevant. What is important is that during ten years of litigation, both parties were aware that their success in the federal action would impact their success in the state court action. Krumme and the *Allen* plaintiffs litigated their case vigorously in the hope that the outcome would benefit their colleagues in the *Barefoot* case. Similarly, WestPoint launched a top-notch legal defense knowing full well that if it prevailed in the federal action, it would almost certainly prevail in the state case without having to endure another decade-long legal battle.[14] As it turns out, West-

---

**13.** In fact, the doctrine of collateral estoppel was invoked by the *Barefoot* court in 1994 to preclude WestPoint from relitigating an issue that had already been decided by this Court. *See Barefoot*, 129307/93, slip. op. at 5.

**14.** Indeed, this is almost certainly the reason that WestPoint pursued litigation in the *Krumme* and *Allen* cases beyond what might

seem reasonable considering the amount at issue in those two cases alone. That is, it was economically rational for WestPoint to expend monies including its own attorneys' fees and plaintiffs' attorneys' fees in excess of the amount at issue in *Allen* and *Krumme* in light of the *Barefoot* litigation. *See supra* note 12 and accompanying text; *infra* Part III.A.3.

Point "benefitted" in the sense that it prevailed on the key issues. However, both parties are benefitted in the sense that the meaning of the EPI Amendment has been conclusively settled and the years of litigation are finally at an end. *Compare Colon*, 343 N.Y.S.2d at 883 (finding that interpretation of indemnification agreement in favor of one party "will be of benefit to both parties").

### (c) Lodestar Analysis

The foregoing discussion does require WestPoint to pay all of plaintiffs' legal expenses no matter how exorbitant they may be. Indeed, pursuant to the language of the EPI provision itself, WestPoint agreed to pay plaintiffs' "reasonable" attorneys' fees; it did not agree to pay inflated and unjustified fees or expenses. Thus, plaintiffs' fee requests must meet the factors of reasonableness set forth above, *see supra* Part III.A, with the caveat that the amount in controversy is not an applicable factor in this case.

After reviewing the voluminous compilations of billing statements and affidavits submitted by plaintiffs and their counsel, and after presiding over this action for almost five years, I find that the majority of plaintiffs' requested attorneys' fees are reasonable for the following reasons. *First*, this litigation involved several complex and novel issues of law which required extensive briefing in both this Court and the Second Circuit, not to mention two trials. *Second*, plaintiffs' counsel are highly skilled attorneys and Morgan Lewis and Chadbourne are well-established and preeminent law firms. Plaintiffs' counsel litigated the *Krumme* and *Allen* cases responsibly and vigorously, and their briefs and trial-work reflected a high degree of preparation and in-depth analysis that was of benefit to both the Court and their clients.[15] *Third*, the difficulty of the legal issues and the complexity

and duration of the litigation required an extensive amount of time and labor on the part of plaintiffs' counsel.

*Fourth*, the rates charged by Morgan Lewis and Chadbourne over the ten-year period of litigation were in line with the customary legal fees charged in the Southern District of New York, and they were also the customary rates charged by Morgan Lewis and Chadbourne for their other clients. *See* Hausen Aff. (Chadbourne) ¶ 6; 1/22/99 Affidavit of James W. Harbison, Jr., Counsel for Plaintiff Krumme (Morgan Lewis) ¶ 12. *Fifth*, there is absolutely no indication of fraud or manipulation on the part of plaintiffs and their counsel which would cause me to reduce their requests for fees. Again, I was impressed and appreciative of the high-quality work produced by all counsel in these cases. This was a long and, at times, bitter dispute that was hotly and ably litigated for more than a decade. As the *Colon* court aptly stated at the conclusion of its opinion:

> I am convinced that BOAC's retainer agreement was made in good faith and that it was untainted by any acts of fraud, collusion, overreaching or attempts to foist an excessive attorney's fee upon [the co-defendant].... Upon what equitable basis then should BOAC receive less than it obligated itself to pay its attorneys? Frankly, I can see no equitable reason why BOAC should not be .fully reimbursed; nor why the court should interfere with the retainer agreement between BOAC and its attorneys by reducing the amount.

*Id.* at 883.

Like the court in *Colon*, I see no equitable reason why plaintiffs' requests for attorneys' fees should not be granted in their current form. That said, however, in reviewing bills submitted for the ten-year period, I found several charges by plain-

---

**15.** It must also be noted that defendant was represented by counsel from Winthrop, Stimson, Putnam & Roberts, a similarly well-established and preeminent law firm. Defen-

dant's counsel litigated and relitigated every possible issue, forcing plaintiffs' counsel to respond accordingly.

tiffs' counsel that were duplicative and excessive. Again, I do not believe that these charges were motivated by any ill-purpose or an attempt to manipulate WestPoint. Rather they are the almost unavoidable result of many attorneys at large law firms working on the same legal issues for a long period of time. Rather than setting forth a line-by-line analysis here, I reduce each of plaintiffs' requests by 20% [16] and award attorneys' fees exclusive of interest as follows: [17]

| CASE | COUNSEL | FEES |
| --- | --- | --- |
| Krumme | Krumme | $121,350 |
| | Morgan Lewis | $683,551 |
| Allen | Krumme | $319,860 |
| | Chadbourne | $1,503,699 |

### 2. Arrangement Plaintiffs Would Have Made Absent Fee Provision is Inapplicable

■ *F.H. Krear, Diamond D* and *In Time Prods.* set forth an additional "index" of reasonableness: "whether the fee arrangement is 'grossly disproportionate to the arrangement the plaintiff would have been expected to make with counsel in the absence of a fee-shifting agreement.'" *Diamond D,* 979 F.2d at 20 (quoting *F.H. Krear,* 810 F.2d at 1263); *see also In Time Prods.,* 38 F.3d at 667. As set forth above, the Magistrate relied upon this index in capping plaintiffs' award at one-third the amount in controversy, reasoning that absent the EPI fee provision, plaintiffs would have entered into a one-third contingency arrangement with their counsel. *See* Report at 25. Similar to the amount in controversy, consideration of the arrangement plaintiffs would have made with their counsel absent the EPI fee provision is inappropriate in the instant case.

To begin, the Second Circuit has applied this index of reasonableness solely in cases involving classic fee-shifting clauses where there is a concern that parties may " 'manipulate the actual damage incurred by burdening [his adversary] with an exorbitant fee arrangement.' " *See Diamond D,* 979 F.2d at 20 (quoting *F.H. Krear,* 810 F.2d at 1263) (alteration in original). As discussed above, however, the EPI provision is not a fee-shift, and it does not raise the same concerns regarding manipulation and fraud that are typically associated with a loser-pays arrangement. In addition, I have already determined, after carefully examining the bills submitted by plaintiffs in support of their fee applications, that there is absolutely no evidence of manipulation, fraud or an attempt to burden WestPoint with an exorbitant fee arrangement.

This additional requirement—that plaintiffs enter into the same agreement with counsel that they would have entered absent a provision for attorneys' fees—also contravenes the purpose of the EPI fee provision. As set forth above, plaintiffs were meant to rely on the EPI fee provision so that they could retain effective legal counsel and litigate their claims against the company on a level playing field. Moreover, the EPI fee provision is not conditional. WestPoint is obligated to compensate plaintiffs for their attorneys' fees no matter what the outcome of the litigation. Put simply, there is no reason that plaintiffs should not have relied on the fee provision when retaining counsel, and to retroactively require that plaintiffs' agreements with their counsel mirror the agreements they would have made absent the EPI fee provision is patently unfair.

A contingency fee arrangement such as the one imposed by the Magistrate similarly contravenes the terms of the EPI fee

---

**16.** A court may "exclude excessive and unreasonable hours from its fee computation by making an across-the-board reduction in the amount of hours." *See Luciano v. Olsten Corp.,* 109 F.3d 111, 117 (2d Cir.1997) (af-

firming district court's 15% reduction of plaintiff's requested hours).

**17.** The proper amount of interest is calculated *infra* Part III.C.

provision. The EPI fee provision obligates WestPoint to compensate plaintiffs "on a current basis." That means that as time and effort is expended by counsel, West-Point is obligated to compensate plaintiffs for those expenses. In contrast, a contingency fee arrangement provides payment of attorneys' fees only at the end of the litigation, not on a regular basis during the proceedings. Accordingly, to sua sponte craft an award of attorneys' fees based on a contingency arrangement makes little sense in light of the terms of the EPI provision.

Plaintiffs entered into reasonable agreements with their counsel in justified reliance on the EPI fee provision. To the extent plaintiffs' fees should be reduced, the lodestar approach applied above is the appropriate method because it honors the nature and the terms of the EPI fee provision.

### 3. Amount in Controversy

█ Assuming, arguendo, that the EPI fee provision was not exempt from the general rule that reasonable attorneys' fees should not exceed the amount in controversy, a cap is still inappropriate because plaintiffs' requested fees do not, in fact, exceed the true amount in controversy. In determining the amount in controversy in *Krumme* and *Allen,* the Magistrate included only "the value of the benefits that the plaintiffs in *Allen* and *Krumme* would have been entitled to had they fully prevailed in the litigation with the contractual interest that would have accrued." *See* Report at 24. The Magistrate found that the amount in controversy was $692,159 in *Krumme* and $2,815,981 in *Allen. See id.* at 24–25.

The Magistrate did not aggregate the monies at issue in the two federal cases. Moreover, he declined to include approximately $7 million dollars at issue in the *Barefoot* litigation stating that "[i]n the absence of the fee-shifting provision, the plaintiffs in *Krumme* and *Allen* would never have agreed to pay a fee based on any additional recovery made by plaintiffs in an entirely separate case." *See id.* at 22. In their objections, plaintiffs contend that the amount in controversy should include the monies at issue in all three cases which would total more than $11 million. *See* Krumme Obj. at 11–14; Allen Obj. at 15. I agree for the following reasons.

As discussed in the preceding section, there is no reason for plaintiffs' litigation decisions to be considered "absent the [EPI fee] agreement". Thus, it is irrelevant that Krumme and the *Allen* plaintiffs would not have "agreed to pay a fee based on additional recovery" in the state court case absent the EPI fee provision. Instead of considering what plaintiffs would have done absent the fee agreement, the Magistrate should have considered what actually occurred in the litigation.

The state and federal plaintiffs were colleagues and victims of what they perceived to be the same violation of their rights to benefits under the EPI Program. Moreover, all thirty-seven plaintiffs had a contract with WestPoint whereby WestPoint agreed to compensate them for their litigation expenses. That the thirty-seven plaintiffs decided to jointly plan and litigate their state and federal actions is understandable, reasonable and efficient.[18] According to plaintiffs, they and their

---

**18.** The *Barefoot* court favorably acknowledged plaintiffs' efforts to avoid duplicative litigation:

> [I]t appears from the plaintiffs' argument that it was reasonable for them to have delayed the commencement of this action until a decision had been reached in the Federal Court in the *Allen* case, particularly in view of Judge Conboy's decision in the *Allen* case dismissing the complaint, which

was subsequently reversed by the Second Circuit. Further, plaintiffs' argument that the commencement of the instant action was delayed with the purpose of saving defendants the expense of attorneys' fees and not burdening the courts with two "redundant" proceedings is reasonable.

*Barefoot,* 129307/93, slip. op. at 6–7 (citations omitted).

counsel concentrated all of their resources on the federal action in an effort to avoid litigating the same case in two forums. *See* Allen Obj. at 12–13. The apparent hope was that if Krumme and the *Allen* plaintiffs were successful, the *Barefoot* plaintiffs would receive an identical judgment without having to engage in further litigation. Thus, the plaintiffs perceived the three actions as joined, and they considered the total amount of their claims as in excess of $11 million.

Also relevant is the fact that WestPoint surely must have considered the amount in controversy to be $11 million. If the federal plaintiffs prevailed in their litigation, the state plaintiffs would almost certainly prevail and WestPoint would be liable for damages in excess of $11 million. WestPoint's perception of the amount in controversy is relevant because litigation is a dynamic process. WestPoint litigated this case vigorously based on its understanding of the monies at stake, and plaintiffs were required to respond in kind. Moreover, as discussed above, WestPoint was in a position to end the litigation in the event that its costs exceeded its liability. That WestPoint continued to litigate this case rather than pursuing other options is evidence that it did, in fact, consider the amount in controversy to be in excess of $11 million. Accordingly, there is no prejudice to WestPoint in aggregating the potential recoveries in the three actions.

I have no doubt that during that during their ten years of federal litigation, both parties considered the monies at issue in the state litigation as part of the "amount in controversy". I therefore find that the amount in controversy was in excess of $11 million dollars. As a result, plaintiffs' fee requests do not, in fact, exceed the amount in controversy.[19]

### B. Fees on Fees

The Magistrate declined to compensate plaintiffs for legal expenses incurred to collect attorneys' fees—commonly referred to as "fees on fees"—finding that under New York law, "'a general contract provision for the shifting of attorneys' fees does not authorize an award of fees for time spent in seeking the fees themselves.'" *See* Report at 20 (quoting *Krear*, 810 F.2d at 1266). In their objections, plaintiffs argue that fees on fees should be awarded because if the EPI fee provision had been properly followed and WestPoint had reimbursed plaintiffs on a current basis, the instant fee application would have been unnecessary. *See* Krumme Obj. at 15; Allen Obj. at 19. Plaintiffs also contend that because the EPI fee provision allows recovery for "any dispute as to the validity, interpretation or application of any term or condition of the Agreement", and because "reasonable attorneys' fees" is a term of the agreement, fees on fees should be awarded. *See* Krumme Obj. at 15; Allen Obj. at 19. I agree in part with both the Magistrate and the plaintiffs.

■ To the extent that plaintiffs seek to recover fees in connection with litigation of unique aspects of the EPI fee provision, I find that those fees are recoverable. For example, in *Allen*, the defendants contended that the EPI fee provision only applied to disputes between plan participants and a hostile acquirer. *See* 933 F.Supp. at 269. The parties also disputed whether a change of control had occurred for purposes of triggering the fee provision. *See id.* at 270. Similarly, in *Krumme*, the parties litigated the effect of the *Allen* plaintiffs' releases on their ability to recover attorneys' fees. *See* 22 F.Supp.2d at

---

**19.** Ironically, it is the defendant who benefits most from plaintiffs' litigation strategy. WestPoint was obligated to pay attorneys' fees for thirty-seven plaintiffs. However, under the *Krumme, Allen* and *Barefoot* collective litigation strategy, only ten of the those thirty-seven plaintiffs were actively incurring attor-

neys' fees. Moreover, now that WestPoint has prevailed in the federal litigation, it will almost surely prevail in the state litigation and therefore the attorneys' fees it pays to *Krumme* and the *Allen* plaintiffs represent the vast majority of the attorneys' fees it will be obligated to pay.

179–80. These examples represent more than an action to collect attorneys' fees. Instead, they were bonafide disputes over the terms of the EPI fee provision, and thus plaintiffs are entitled to recover legal costs in connection with the litigation of those issues. Accordingly, to the extent plaintiffs' fee requests include expenses incurred in litigating the terms of the attorneys' fees provision, those costs are awarded.

■ On the other hand, fees incurred in connection with the instant application to collect attorneys' fees are not recoverable. Although it is possible to contract for the payment of fees incurred to collect fees, "specific language would be needed to show such an agreement." *Swiss Credit Bank v. International Bank, Ltd.*, 23 Misc.2d 572, 200 N.Y.S.2d 828, 831 (Sup. Ct.N.Y.Co.1960). I agree with the Magistrate that the EPI fee provision includes no specific language that would allow the plaintiffs to recover the costs of collecting an award of reasonable attorneys' fees. Plaintiffs' arguments to the contrary are not persuasive. True, defendant's timely payment of fees under the EPI provision may have eliminated the need for a separate application. However, that is not necessarily the case. Even if defendant had paid plaintiffs' fees on a current basis, there is no guarantee that disputes regarding a "reasonable" amount of fees would not have arisen intermittently. Moreover, as the Magistrate stated in his Report, "[i]f [the EPI fee provision] were construed as satisfying the specificity requirement under New York law, the exception would swallow the rule." Report at 21.

Accordingly, the plaintiffs cannot recover fees in connection with the instant proceeding before the Magistrate and this Court for the collection of reasonable attorneys' fees.

### C. Calculation of Interest

In their Objections to the Report, the plaintiffs state that "[i]f the Court finds that the fees should not be capped as recommended by Magistrate Judge Francis, then the interest formula used by the Report would not be materially inaccurate and plaintiffs would not object to use of the formula." *See* Allen Obj. at 19 n. 6; Krumme Obj. at 17–18. Because I find that the Magistrate's formula provides a simple and accurate way to calculate the appropriate interest on both the reduced (but uncapped) attorneys' fees and the reduced costs, and because the plaintiffs do not object,[20] the amount of contractual interest through March 31, 1999 is recalculated below using the Magistrate's formula:[21]

20. As set forth above, defendant objects generally to any award of contractual interest, an argument that is without merit for the reasons articulated in the Report. Defendant's only specific objection to the Magistrate's computation of interest is that he improperly "double counted" interest by including interest in the "total amount in controversy" from which he calculated reasonable attorneys' fees and then by adding interest to those fees. *See* WestPoint Obj. at 15–16. *Regardless of the merits of defendant's argument, it is mooted by my finding in the preceding section that reasonable attorneys' fees will not be determined as a percentage of the amount in controversy.*

21. The Magistrate's formula calculates the appropriate interest factor by determining the ratio of the interest requested to the principal amount of fees and costs requested and multiplying that ratio by the principal fees and costs actually awarded. The formula is as follows:

$$\frac{IR}{FR + CR} \times (FA + CA) = IA$$

IR = Interest Requested
IA = Interest Awarded
FR = Fees Requested
FA = Fees Awarded
CR = Costs Requested
CA = Costs Awarded

## INTEREST IN <u>KRUMME</u> CASE THROUGH 3/31/99

(1) Krumme
$$\frac{245{,}259}{151{,}688 + 814} \times (121{,}350 + 814) = \$196{,}468$$

(2) Morgan Lewis
$$\frac{786{,}748}{854{,}439 + 53{,}791} \times (683{,}551 + 46{,}660) = \$632{,}540$$

## INTEREST IN <u>ALLEN</u> CASE THROUGH 3/31/99

(1) Krumme
$$\frac{192{,}682}{399{,}825 + 5{,}830} \times (319{,}860 + 5{,}830) = \$154{,}699$$

(2) Chadbourne
$$\frac{965{,}652}{1{,}879{,}624 + 138{,}484} \times (1{,}503{,}699 + 91{,}583) = \$763{,}332$$

Because interest accrues through the date of judgment, however, plaintiffs are entitled to an additional seven months of contractual interest for the time period between March 31, 1999 and the date of this Opinion and Order, October 28, 1999. That additional interest is calculated by determining the total amount due for each counsel through March 31 (total fees + total costs + total interest through 3/31/99) [22] and multiplying that principal by the contractual interest rate.[23] Accordingly, interest is awarded as follows:

| CASE | COUNSEL | INTEREST THROUGH 3/31/99 | INTEREST FROM 3/31/99 to 10/28/99 | TOTAL |
|---|---|---|---|---|
| <u>Krumme</u> | Krumme | $196,468 | $ 16,399 | $212,867 |
| | Morgan Lewis | $632,540 | $ 81,209 | $713,749 |
| <u>Allen</u> | Krumme | $154,699 | $ 28,629 | $183,328 |
| | Chadbourne | $763,332 | $140,556 | $903,888 |

## IV. Supplemental Report

In his Supplemental Report, the Magistrate awarded Krumme $9,359 in costs for expert fees charged by Skadden in May

22. The total amount due for each counsel through March 31 is:

| Case | Counsel | Total Fees | Total Costs | Interest 3/31/99 | Amount Due |
|---|---|---|---|---|---|
| <u>Krumme</u> | Krumme | $ 121,350 | $814 | $196,468 | $318,632 |
| | Morgan Lewis | $683,551 | $46,660 | $632,540 | $1,362,751 |
| <u>Allen</u> | Krumme | $319,860 | $5,830 | $154,699 | $480,389 |
| | Chadbourne | $1,503,699 | $91,583 | $763,332 | $2,358,614 |

23. Under the EPI Amendment, interest accrues at a rate of two points above the prime lending rate, compounded daily. *See* Report at 7. For purposes of determining plaintiffs' additional interest for the seven months since March 31, 1999, the proper interest rate was determined by adding two points to the Federal Reserve Bank's prime lending rate for each of the relevant months: 7.75% + 2 for April through June; 8% + 2 for July and August; and 8.25% + 2 for September and October. Moreover, for purposes of simplicity, interest was compounded monthly rather than daily. The difference between compounding monthly rather than daily for the seven month time-period at issue is de minimis.

1996.[24] However, the Magistrate declined to add contractual interest to the award finding that "[a]lthough Skadden billed the plaintiffs in May 1996, it never sought to collect, and therefore the plaintiffs have not lost the time value of money." Supplemental Report at 2. The Magistrate also stated that "there is no evidence that Skadden imposed interest charges on the plaintiffs in connection with the delayed payment of its bill." *Id.* I am puzzled by the Magistrate's reasoning, because it contradicts the reasoning he followed in awarding contractual interest on all of plaintiffs' other fees and costs.

To begin, there is evidence that Skadden imposed interest charges on plaintiffs for the late payment of its bill. In his initial fee application submitted to the Magistrate, Krumme included the following explanation:

> Tab 6 contains the fees of Skadden retained as an expert witness and used in the Joint Actions. This firm was to be paid on a current basis but is relying on my contract right for interest under the Amendment to make it whole. The amount I receive for this firm will be paid over to it upon receipt of the funds from Defendant.

1/15/99 letter from Krumme to Judge Francis. Moreover, Tab 6 includes a bill for $9,359 that was sent from Skadden to Krumme on May 28, 1996.

█ In his Report, the Magistrate concluded with respect to awards of contractual interest that WestPoint's "liability for interest arises as soon as payment must be made, and the payment of fees and costs was required 'on a current basis' [under the EPI Amendment].... Therefore, the plaintiffs are entitled to interest at the contractual rate from the date the fees and costs were incurred until the date of judg-

ment." Report at 30. Thus, in accordance with the Magistrate's own findings, interest accrues from the date costs are incurred. Skadden's charges for expert fees should be treated no differently than all of plaintiffs' fees and costs. The Magistrate did not make counsels' collection efforts or disbursement of funds by plaintiff a condition to contractual interest on any other award of fees and costs, and I see no reason why such a condition should be imposed here. As plaintiffs argued in their objections to the Supplemental Report:

> Had Mr. Krumme, in his legal capacity, or other plaintiffs' counsel paid the Skadden bill, it would have been an attorneys' disbursement. Such disbursements were correctly awarded by the Magistrate Judge with full contract interest. Given the Executives' contract right to payment by WestPoint of such costs on a current basis, their use of the contract was a perfectly appropriate means of negotiating payment with Skadden. Plaintiffs' expert should not be penalized for loss of the value of money by its reliance upon its expert fee to be awarded as costs, with interest, as called for by the contract ... The EPI amendment does not require Skadden to perform an artificial step of demanding fee payment on a current basis or of demanding interest in order to be entitled to both, given the EPI Amendment which on its faces calls for WestPoint to pay both.

Plaintiffs' Partial Objection to Supplemental Report and Recommendation at 3. Krumme incurred $9,359 in legal costs from Skadden in May 1996. Accordingly, Krumme is entitled to contractual interest on Skadden's expenses from May 28, 1996 to the present.[25] Such interest is calculat-

---

**24.** This item was overlooked in the Magistrate's initial Report. *See* Supplemental Report at 1.

**25.** I decline, however, to award interest on portions of Skadden's fees from 1991 and 1995 as requested by Krumme in his applica-

tion. With respect to any award of interest from those years, I agree with the Magistrate that there is no indication that Skadden expected payment prior to May 1996. Krumme has submitted a single bill from Skadden dated May 1996. *See* 1/15/99 letter from Krum-

ed below using the interest accumulation factor from May 31, 1996 to March 31, 1999 as set forth in plaintiffs' submissions, *see* Allen Obj., Ex. A at 2, and multiplying the resulting amount by the contractual interest rates for April 1999 through October 1999, compounded monthly:

(1) Principal and Interest through March 31, 1999

$$\$ \, 9,359 \quad \times \quad 1.339176156 \quad = \quad \$12,533$$

(2) Interest From March 31, 1999 through October 28, 1999

$$\$12,533 \quad \times \quad \begin{array}{l}\text{[contractual interest rate} \\ \text{from 3/31/99 to 10/28/99,} \\ \text{compounded monthly]}\end{array} \quad = \quad \$748$$

(3) Total Interest

$$\$12,533 \quad - \quad \$9,359 \quad = \quad \$3,174$$

$$\$748 \quad + \quad \$3,174 \quad = \quad \$3,922.$$

Accordingly Krumme is awarded $3,922 interest on Skadden's expert fees.

## V. Conclusion

For the foregoing reasons, I decline to cap the award of attorneys' fees at one-third the amount in controversy and instead award plaintiffs the full amount of attorneys' fees requested, less twenty percent and including fees incurred in litigating the terms of the EPI fee provision. In addition, I award Krumme $3,922 in interest on the expert fees charged by Skadden. Accordingly, the Magistrate's fee award is modified as follows:

### DISTRICT COURT'S MODIFIED FEE AWARD

| CASE | COUNSEL | FEES | COSTS | INTEREST | TOTAL |
|---|---|---|---|---|---|
| Krumme | Krumme | $121,350 | $814 | $212,867 | $335,031 |
| | Morgan Lewis | $683,551 | $46,660 | $713,749 | $1,443,960 |
| Allen | Krumme | $319,860 | $5,830<br>$9,359 | $183,328<br>$3,922 | $522,299 |
| | Chadbourne | $1,503,699 | $91,583 | $903,888 | $2,499,170 |

Now that all outstanding issues have been resolved, a judgment should be entered and the Clerk of the Court is directed to close these cases.

me to Judge Francis at Tab 6. That bill makes no reference to what charges were incurred when; it simply sets forth a total bill of $ 9,359 for services rendered. In fact, even though the bill attaches a detailed breakdown of hours expended indicating that Skadden did perform work in 1991 and 1995, that breakdown does not apply a monetary value to the hours expended in those years. *See id.* Instead, like the May 1996 bill, it simply includes a total amount charged for services rendered. Thus, Krumme is not entitled to interest on Skadden's expenses prior to May 1996.