Gordon E. ALLEN, John Currier, James J. Dunne, Leo Fornero, Gerard P. Mandry, Norman K. Matheson, Bruce E. Moore, Nicholas Pallota and Cochran B. Supplee, Plaintiffs,

v.

WESTPOINT–PEPPERELL, INC., D. Michael Roark, C. Powers Dorsett and Barry F. Shea, Defendants.

Robert D. KRUMME, Plaintiff,

v.

WESTPOINT–PEPPERELL, INC., Defendant.

Nos. 90 Civ. 3841 (SAS), 89 Civ. 2016 (SAS).

United States District Court, S.D. New York.

May 13, 1996.

Robert J. Hausen, Ralph A. Rossi, Chadbourne & Parke, New York City, for Plaintiffs Gordon Allen, et al.

Michael A. Kalish, Francis Carling, Frederick A. Brodie, Mara Lozier Shore, Winthrop, Stimson, Putnam & Roberts, New York City, for Defendants West Point–Pepperell, Inc., et al.

James W. Harbison, Jr., Morgan, Lewis & Bockius, New York City, for Plaintiff Robert D. Krumme.

### OPINION AND ORDER

SCHEINDLIN, District Judge:

This opinion addresses two issues vital to the resolution of these actions: (1) whether the releases executed in connection with the *Allen* Plaintiffs' lump sum payouts under the

EPI Amendment should be rescinded, and (2) whether Plaintiffs are entitled to have their attorneys' fees paid by Defendant WestPoint–Pepperell, Inc. The Court held a bench trial from January 3 to January 9, 1996 on these issues. The Findings of Fact and Conclusions of Law set forth below are based on this trial and a two day bench trial held December 27–28, 1995 on related issues.

## I. *Background*

### A. *Parties*

The Plaintiffs in this action are former executives of Cluett Peabody & Co. ("Cluett"), an apparel manufacturer which was acquired by Defendant WestPoint–Pepperell, Inc. ("WestPoint") in 1986. West-Point is a Georgia corporation conducting business in textile, apparel and bed products. Cluett was merged into WestPoint in January 1989 and operated as a division of West-Point until March 1990, when Cluett was sold to Bidermann Industries, Inc.

Defendant D. Michael Roark ("Roark") was Vice President of Human Resources for Cluett at all relevant times until 1986, and then Vice President of Human Resources for WestPoint until May 1989. Defendant C. Powers Dorsett ("Dorsett") was, at all relevant times, WestPoint's General Counsel. Defendant Barry F. Shea was Assistant Treasurer and then Treasurer of WestPoint, and a member of the Cluett Retirement Plan Committee. Patrick Walsh ("Walsh"), not a party to this action, was, at all relevant times, Assistant Treasurer of Cluett, and the day-to-day administrator of the Executive Permanent Insurance Program ("EPI Program").

### B. *Factual Background*

In 1975, Cluett established for its senior executives an employee benefit program known as the EPI Program. This program consists of retirement and life and health insurance benefits, including a deferred compensation agreement which provides supplemental pension benefits. Plaintiffs are participants in the EPI program and are parties to a deferred compensation agreement under that program.

On July 29, 1987, WestPoint's Compensation Committee recommended that Cluett's Board adopt a "Change in Control" amendment to the EPI Plan (the "EPI Amendment"), which would provide EPI participants with a lump sum payment upon a "Change in Control" of WestPoint. Cluett's Board approved the EPI Amendment on July 30, 1987, although it was not finalized until November 1988. On November 11, 1988, the EPI Amendment was circulated to the EPI participants; within a few weeks, Plaintiffs all returned executed copies of this Amendment.

In late 1988 and early 1989, WestPoint took steps to change the discount rate used to calculate the lump sums that EPI participants would receive if a "Change in Control" occurred. The EPI Amendment referred to the actuarial assumptions contained in the Cluett Employee Retirement Plan ("Cluett Pension Plan"), which provided for a 5% discount rate. WestPoint sought to make this rate conform to that used in the West-Point Employee Retirement Plan ("West-Point Pension Plan"), which provided for a discount rate based on rates published by the Pension Benefit Guaranty Corporation ("PBGC"). Accordingly, the Cluett Pension Plan Committee ("Cluett Committee") met on February 16, 1989 and purported to adopt a PBGC-based rate for the Cluett Pension Plan.[1]

The following week, Roark sent each EPI participant a letter, dated February 22, 1989, advising that lump sum payments would be calculated using a PBGC-based rate of 9.3%. Accompanying this letter was an election form which gave the participants two choices: (1) they could receive the lump sum payment based on the PBGC-based rate and release WestPoint from any further obligation; or (2) they could revoke the November 11, 1988

---

1. The group that met on February 16, 1989 consisted of the members of the WestPoint Management Pension Committee. In 1988, the WestPoint Management Pension Committee was appointed by the Cluett Board of Directors to act as the Cluett Committee. *See Allen v. West Point–Pepperell, Inc.*, 908 F.Supp. 1209, 1214 (S.D.N.Y.1995). Thus, this group acted as the Cluett Committee at its February 16 meeting.

EPI Amendment and forfeit the right to receive a lump sum payment. Each of the *Allen* Plaintiffs checked a box indicating that he was selecting the first option, and returned the form to Roark.[2] On or about April 5, 1989, the *Allen* Plaintiffs each received a lump sum payment calculated using a 9.3% discount rate.

In an Opinion and Order dated November 2, 1995, I held that the Cluett Committee had no authority under ERISA to change the discount rate contained in the Cluett Pension Plan. *See Allen v. West Point–Pepperell, Inc.*, 908 F.Supp. 1209, 1222 (S.D.N.Y.1995). "Accordingly, the 5% discount rate printed in the Cluett Pension Plan was never validly changed and was at all relevant times one of the actuarial assumptions 'contained in' the Cluett Pension Plan for purposes of the EPI Amendment." *Id.* at 1222–23.

The *Allen* Plaintiffs now seek rescission of the releases they executed in early 1989. They contend that rescission is appropriate because the releases were the product of a "mutual mistake" on the part of WestPoint and themselves concerning the discount rate contained in the Cluett Pension Plan. In addition, both the *Allen* Plaintiffs and Robert Krumme seek attorneys' fees pursuant to a provision contained in the EPI Amendment which provides that an executive will be paid or reimbursed for fees "[i]f at any time upon or after a change in control there should arise any dispute" concerning an interpretation of the EPI Amendment.

## II. *Findings of Facts*

On January 27, 1987, the WestPoint Board of Directors discussed the possibility of amending its employee benefit plans to protect participants in the event the company experienced a change in control. The Board instructed management to review all employee benefit plans and to report back to the Board with its recommendations. *See* Minutes of January 27, 1987 Board Meeting, Def. Ex. A. After management conducted such a review, Dorsett, WestPoint's General Counsel, presented his report and recommendations to the WestPoint Board's Compensation Committee on June 23, 1987. *See* Minutes of June 23, 1987 Compensation Committee Meeting, Def. Ex. KK. The Compensation Committee approved management's recommendations and resolved to present them to the full Board. *See id.*

The Compensation Committee reported management's recommendations to the Board on June 24, 1987. With respect to the EPI Program, management recommended that "the present value of the benefit be paid by way of lump sum upon a change in control." Compensation Committee Report, Def. Ex. B. No specific method of determining present value was mentioned in management's recommendations; the intent was simply to provide "the fair present value that would be properly calculated with a realistic interest rate." Testimony of C. Powers Dorsett, General Counsel of WestPoint, Trial Transcript ("Tr.") 913.

In the month following the June 24, 1987 Board meeting, draft amendments to several of WestPoint's benefit plans (including the EPI Program) were prepared. These amendments were presented to, and approved by, the WestPoint Compensation Committee at a meeting on July 29, 1987. *See* Minutes of July 29, 1987 Compensation Committee Meeting, Def. Ex. C. At this time Cluett, although owned and controlled by WestPoint, still had its own Board of Directors. The Compensation Committee thus recommended to the Cluett Board that it adopt the proposed amendment to the EPI Program permitting lump sum payments in the event of a change of control. Tr. 916. On July 30, 1987, the Cluett Board authorized management to enact such an amendment. *See* Action of Cluett Board, Pl.Ex. 119.

### A. *Drafting of the EPI Amendment*

Ronald Heller, then General Counsel of Cluett, prepared the initial draft of the EPI Amendment. Tr. 916. The draft provided for participants to receive, upon a change in control, the present value of their accrued EPI benefit, defined as the "actuarial equivalent" of that benefit. Section 4A(1)(c) of the

---

**2.** Plaintiff Robert Krumme refused to sign the release.

draft EPI Amendment defined "actuarial equivalent" as follows:

> The term "Actuarial Equivalent" means, with respect to an Accrued Benefit, any Deferred Compensation (or contingent Deferred Compensation, as the case may be) benefit provided under the terms of this Agreement which has the same present value as the Accrued Benefit. For the purpose of establishing whether a benefit is the Actuarial Equivalent of another benefit the actuarial assumptions contained in Cluett's Employee Retirement Plan shall be employed for so long as that Plan remains in existence and if such Plan is no longer in existence, the actuarial assumptions last used by such Plan shall be used.

This language was based on a change in control amendment to the WestPoint Supplemental Executive Retirement Plan (the "SERP Amendment"), which Heller used as a model in drafting the EPI Amendment. Tr. 918–19. Indeed, the definition of "actuarial equivalent" in the two amendments is identical except in one respect: where the SERP Amendment refers to the actuarial assumptions contained in WestPoint's Pension Plan, Heller referenced the assumptions contained in the Cluett Pension Plan. *Id.*

The actuarial assumptions in the Cluett Pension Plan had not been changed for many years and were outdated. The Plan provided for a discount rate of 5%, which was well below the market rate. When TPF & C, an actuarial services firm, became the Plan Actuary for the Cluett Pension Plan in 1986, it notified WestPoint of this problem and recommended that the PBGC based rates used in the WestPoint Pension Plan be adopted for the Cluett Pension Plan. However, under the Cluett Pension Plan, lump sums were only payable in *de minimis* amounts;[3] accordingly, substantial sums were not at stake and WestPoint declined to assign a high priority to changing the actuarial assumptions. *See* Deposition of Steven A. Harrold, Vice

President of TPF & C, dated July 27, 1989, at 100–01, 105–06, 107; Deposition of Steven A. Harrold, dated December 6, 1994, at 57–58, 113–16.

## B. *Finalizing the EPI Amendment*

Although the change in control amendments to WestPoint's other benefit plans were implemented in 1987, this was not the case with the EPI Amendment. While working on the Amendment, Heller discovered that—under certain circumstances—it could result in payments duplicative of benefits provided under the EPI Program's life insurance policy. Without a ready solution to this problem, the WestPoint legal staff temporarily shelved the EPI Amendment. Tr. 921–22.

On October 24, 1988, Farley Inc. launched a takeover bid for WestPoint. Complaint ¶ 19. As a result of this action, WestPoint conducted a review of its unfunded employee benefit plans. During that review, management discovered that the EPI Amendment had never been finalized. Tr. 924. Dorsett then instructed Clay Humphries, a WestPoint attorney, to take the steps necessary to get the Amendment finalized. *Id.* Dorsett told Humphries to draft the EPI Amendment in a manner consistent with WestPoint's other change in control amendments. Tr. 1040.

Humphries obtained a copy of the Heller draft and hurriedly began finalizing it. Because he was completely unfamiliar with the EPI plan, Humphries was reluctant to make any substantive changes. Tr. 1013. Additionally, he did not know that the actuarial assumptions contained in the Cluett Pension Plan differed from those contained in the WestPoint Pension Plan; thus, although he had been instructed to make the EPI plan consistent with WestPoint's other plans, he left intact the Amendment's reference to the actuarial assumptions contained in the Cluett Pension Plan. Tr. 1017, 1019.[4]

---

3. The discount rate in the Cluett Pension Plan was used only for calculating lump sums under $3,500. *See* Deposition of Steven A. Harrold, TPF & C Actuary, dated July 27, 1989, 101–02.

4. It is unclear whether Humphries even noticed that the Heller draft referred to the Cluett Pen-

sion Plan's actuarial assumptions. In any event, he testified that "it wouldn't have jumped out at me, because as far as I was concerned [the Cluett and WestPoint Pension Plans] used the same rates." Tr. 1019.

After amending the Heller draft, Humphries sent a copy of it to Walsh to get his comments. On November 10, 1988, Walsh wrote to Humphries suggesting that the definition of "Actuarial Equivalent" in Section 4A(1)(c) of the draft Amendment be revised to specify that an interest rate of 5% would be used to calculate the present value of future EPI benefits. *See* Undated Draft Amendment, Joint Ex. 6; Walsh Memo, dated November 10, 1988, Joint Ex. 15. Humphries rejected Walsh's suggestion that the discount rate be spelled out because he wanted all change in control amendments to be consistent. He sent Walsh a handwritten note that stated:

> I think we need to adopt the amendment as it is drafted if at all possible, for the sake of uniformity. We have several plans with these amendments and I would like for them to all read alike.

Joint Ex. 15.

When Humphries rejected Walsh's suggested revision, he still did not realize that the actuarial assumptions contained in the Cluett Pension Plan differed from those in the WestPoint Pension Plan. Tr. 1017. He thought he remembered being told by an actuary that the plans all used the same actuarial assumptions. Tr. 1018–19. Moreover, because Humphries had no familiarity with the concept of discount rates, the 5% rate in Walsh's suggested revision did not attract his attention. Tr. 1017. At trial, Humphries expressed regret for his oversight: "I have spent many sleepless nights concerned that I was the one most able to catch this mistake and didn't do it, and all this would have been for naught." *Id.*

On November 11, 1988, the EPI Amendment was circulated to the EPI participants under a cover letter. Consistent with the Board's intent, the cover letter stated that the EPI Amendment would provide for payment "of the present value of the benefits called for under the [Deferred Compensation] Agreement." *See* Letter from Patrick Walsh to EPI Participants, Joint Ex. 19. Each of the Plaintiffs returned an executed copy of the EPI Amendment to Walsh within a few weeks of receiving it.

## C. *WestPoint Discovers the Error*

In early February 1989, Roark learned from Walsh that a 5% discount rate would be used to calculate lump sums under the EPI Amendment. Tr. 1065. The news came as a shock to Roark and was of great concern to him. He was troubled because the Chairman of the Board had instructed management to make the methodology used under the various amendments consistent, and Roark had assured members of the board that this would be done. Tr. 1065–66, 1111. Additionally, Roark believed that a 5% discount rate was "totally inappropriate" given the high interest rates that prevailed at the time. Tr. 1070–71. Indeed, in February 1989, even the interest rate on a 30-year Treasury Bill—a very conservative investment—exceeded 9%. *See* Federal Reserve Statistical Release, Def. Ex. I.

Roark notified WestPoint management that the discount rate referenced in the EPI Amendment was different from that referenced in WestPoint's other plans. After reviewing pertinent sections of the Cluett Pension Plan, WestPoint management determined that the discount rate could be changed by the Cluett Committee (then consisting of members of the WestPoint Management Pension Committee) on the advice of the Plan Actuary. Management believed that if the Plan Actuary agreed that the actuarial assumptions contained in the Cluett Pension Plan were outdated and unfair, the Cluett Committee could adopt new assumptions consistent with those in WestPoint's other plans.

TPF & C, the Plan Actuary, was asked its advice in this regard. On February 16, 1989, TPF & C recommended that new actuarial assumptions be adopted, and that the new assumptions be identical to those in the WestPoint Pension Plan. *See* Letter from Steven A. Harrold, dated February 16, 1989, Def. Ex. H(1). That same day, the Cluett Committee met and, pursuant to the Cluett Pension Plan, purported to adopt the actuarial assumptions recommended by TPF & C. *See* Minutes of February 16, 1989 Pension Committee Meeting, Def. Ex. H(2).

Walsh had informed a number of EPI participants that any lump sum payments they received would be calculated using a 5% discount rate. Tr. 1069. WestPoint's management was concerned that some of those participants might have executed the EPI Amendment with that advice in mind. Tr. 1070. Accordingly, WestPoint decided to inform all EPI participants of the discount rate that would be used in calculating lump sum payments, and to give participants an opportunity to rescind the EPI Amendment if they did not desire a payout calculated with the new rate. Tr. 1069.

On February 22, 1989, Roark wrote to the EPI participants notifying them of the 9.3% rate and affording them the opportunity to rescind their November 11, 1989 EPI Amendments. Roark's letter expressly referred to the fact that some EPI participants "have told us they were led to believe that a 5% discount rate would be used to determine lump sum values." Letter from Roark to EPI Participants, dated February 22, 1989, Joint Ex. 22. Roark's letter appended an election form which required each participant to either (1) execute a release of WestPoint in order to be eligible for a lump sum payment or (2) rescind the EPI Amendment. The release contained the following language:

> I understand that the lump sum payment of the actuarial equivalent of my deferred compensation benefit will be in full satisfaction of all obligations of West Point–Pepperell, Inc., as successor to Cluett, Peabody & Co., Inc., under the terms of my Deferred Compensation Agreement, and that in accepting a lump sum payment I shall thereby release West Point–Pepperell, Inc., its directors, officers, employees, and agents, and its successors and assigns, from all obligations under the Agreement.

Joint Ex. 22. Each of the *Allen* Plaintiffs executed the release.

The *Allen* Plaintiffs understood that the document they were signing released West-Point from any further obligation to them. Tr. 545, 595, 630, 661, 734, 856, 868. They signed the release under the belief that 9.3% was the discount rate referenced in the EPI Amendment. Tr. 518–19, 566, 568–9, 613, 648, 719, 844, 862.[5]

On April 5, 1989, as a result of Farley's tender offer, a change in control of West-Point took place and the *Allen* Plaintiffs were sent lump sum payments calculated using the 9.3% rate. When they received the lump sums, the *Allen* Plaintiffs did not feel they had any dispute with WestPoint; they believed they had been paid the full amount owed to them. Tr. 520–21, 570, 614, 648, 721, 847, 864, 880.

### D. *Krumme*

Unlike the *Allen* Plaintiffs, Robert Krumme refused to sign the release sent on February 22, 1989. In fact, having heard rumors about the purported change in the discount rate, Krumme wrote a letter of protest to Dorsett one day before the release was sent out. In his letter, Krumme stated, *inter alia*, that he believed the proper discount rate was 5%. *See* Letter from Robert Krumme, dated February 21, 1989, Pl.Ex. 71. On March 1, 1989, Krumme sent a letter to Roark reiterating his view that he was entitled to be paid at a 5% discount rate. *See* Letter from Robert Krumme, dated March 1, 1989, Pl.Ex. 73.

On March 8, 1989, Krumme wrote a third letter of protest. In this letter, which was addressed to Dorsett, Krumme threatened to take legal action against WestPoint. *See* Letter from Robert Krumme, dated March 8, 1989, Joint Ex. 23. On March 24, 1989, before the change in control payments were made, Krumme sued WestPoint. *See* Complaint in Krumme Action, Def. Ex. CC. Krumme's complaint alleged, *inter alia*, that the change in the discount rate was ineffective and that, if the Cluett Pension Plan had been amended, the amendment had been accomplished without proper authorization and implementation. *See id.* ¶¶ 28–33.

During the summer and fall of 1989, Krumme contacted several of the *Allen* Plaintiffs to encourage them to bring suit against WestPoint, and to discuss the possibility of their retaining him as counsel. Tr.

---

**5.** Only Plaintiff James J. Dunne doubted whether 9.3% was the appropriate rate when he signed the release. *See* Telephonic Deposition of James J. Dunne, dated December 14, 1994, at 82.

524–25, 571, 615, 651–2; *see also Allen,* 908 F.Supp. at 1216. By September 1989, each of the *Allen* Plaintiffs except John Currier ("Currier") and Gerard P. Mandry ("Mandry") had signed a retainer agreement with Krumme. Plaintiffs Currier and Mandry signed such agreements in March and May 1990, respectively. *See Allen,* 908 F.Supp. at 1216. On June 6, 1990, the *Allen* Plaintiffs filed suit.

### E. Attorneys' Fees

When management recommended installing change in control provisions in various WestPoint benefit plans, it also recommended reimbursing participants for legal fees expended in enforcing their rights under the plan following a change in control. *See* Def. Ex. B. Pursuant to this recommendation, the following fee-shifting language was included in the EPI Amendment:

> If at any time upon or after a Change of Control there should arise any dispute as to the validity, interpretation or application of any term [or] condition of this Agreement ... Cluett agrees, upon written demand by an Executive, to provide sums sufficient to pay on a current basis (either directly or by reimbursing the Executive or his legal representative) the Executive's costs and reasonable attorneys' fees (including expenses of investigation and disbursements for the fees and expenses of experts, etc.) (a) incurred by the Executive in connection with any dispute or litigation, regardless of whether the Executive is the prevailing party, involving any provision of this Agreement, provided that the court in which such litigation is pursued determines, upon application of any party, that the Executive or his legal representative did not initiate frivolously such litigation....

EPI Amendment, Joint Ex. 18. at 5.

### III. Conclusions of Law

#### A. Mutual Mistake

As noted, the *Allen* Plaintiffs seek to rescind the releases on the ground that both they and WestPoint mistakenly believed that 9.3% was the proper discount rate for calculating lump sums under the EPI Amendment. As a general rule, "a contract is voidable under the equitable remedy of rescission if the parties entered into the contract under a mutual mistake of fact which is substantial and existed at the time the contract was entered into." *Rekis v. Lake Minnewaska Mountain Houses, Inc.,* 170 A.D.2d 124, 573 N.Y.S.2d 331, 335 (3d Dep't 1991). However, rescission is not available as a matter of law; it is an equitable remedy that the Court may impose in its discretion, after weighing all the attendant facts and circumstances. *See Alden Auto Parts Warehouse, Inc. v. Dolphin Equip. Leasing Co.,* 682 F.2d 330, 333 (2d Cir.1982) (request for rescission "is addressed to the equity powers of the court"); *Rudman v. Cowles Communications, Inc.,* 30 N.Y.2d 1, 13, 330 N.Y.S.2d 33, 280 N.E.2d 867 (1972) ("plaintiffs are not entitled as a matter of law to rescission. Such relief, lying in equity, is a matter of discretion.").

The facts presented in this case do not justify rescission, which is a "drastic" and "extraordinary" remedy under New York law. *See Canfield v. Reynolds,* 631 F.2d 169, 178 (2d Cir.1980); *In re Kim,* 15 B.R. 198, 200 (Bankr.S.D.N.Y.1981). While the parties were mistaken as to the discount rate in effect when the releases were signed, the *Allen* Plaintiffs were experienced businessmen who knew that they were "releasing" WestPoint from any further obligation to them. By executing the releases, the *Allen* Plaintiffs amended and superseded their EPI Amendments, so that the parties' contracts now called for lump sum payments to be computed using the PBGC-based rate. *See Barnum v. Millbrook Care Ltd. Partnership,* 850 F.Supp. 1227, 1236 (S.D.N.Y.), *aff'd,* 43 F.3d 1458 (2d Cir.1994) ("It is well established that a subsequent contract regarding the same matter will supersede the prior contract.").

The EPI Amendment was intended to give participants the actual present value of their benefits under the EPI Program. When WestPoint discovered that the Cluett Pension Plan's outdated 5% rate applied to the EPI Amendment, it made a good-faith effort to correct this drafting mistake. The fact that seven years later this Court determined

that WestPoint's efforts were ineffective under ERISA is not proper grounds for rescission. *See Anita Foundations, Inc. v. ILG-WU Nat'l Retirement Fund*, 902 F.2d 185, 189–90 (2d Cir.1990) ("a settlement payment, made when the law was uncertain, cannot be successfully attacked on the basis of any subsequent resolution of the uncertainty.").

Rescinding the releases would create an entirely unfair result: WestPoint would be forced to pay the *Allen* Plaintiffs nearly twice the market-based present value of their EPI benefits. *See* Def. Ex. I. Such an outcome would undermine the WestPoint Board's understandable desire to harmonize the payout methodologies used in its various benefit plans. Moreover, it would provide the *Allen* Plaintiffs with an undeserved and unintended windfall.[6]

Several of the *Allen* Plaintiffs testified that they did not seek a windfall, but only a fair approximation of the present value of their benefits under the EPI Program. Tr. 625, 656–7, 851–2, 866. I find that each of them has already received such payment and that rescinding the releases would only work an injustice upon WestPoint. I therefore decline to impose the equitable remedy of rescission.

### B. *Attorneys' Fees*

The attorneys' fee clause contained in the EPI Amendment is extremely broad. It provides costs and attorneys' fees to an executive for "any dispute as to the validity, interpretation or application of any term [or] condition of this Agreement ... regardless of whether the Executive is the prevailing party." Joint Ex. 18. The only require-

ments are that the dispute arise "upon or after a change of control," and that the executive does not "frivolously" bring suit.

■ Defendants contend that the fee-shifting clause was only intended to apply to disputes with a hostile acquiror such as Farley, not disputes with WestPoint's prior management. However, on its face the clause does not distinguish between disputes with outgoing management and those with incoming management. Rather, it mandates that an executive be compensated for "*any* dispute" concerning the interpretation or application of any term of the EPI Amendment (provided the dispute arises upon or after a change in control, and is not frivolous). Where a contract's language is unambiguous, " 'its meaning must be determined from the four corners of the instrument without resort to extrinsic evidence of any nature.' " *Goodheart Clothing Co. v. Laura Goodman Enterprises, Inc.*, 962 F.2d 268, 272 (2d Cir. 1992) (quoting John D. Calamari & Joseph M. Perillo, *Contracts* 166–67 (3d ed. 1987)). I therefore reject Defendants' claim that the clause does not apply to disputes with WestPoint's old management.[7]

Neither the *Allen* action nor the *Krumme* action could reasonably be termed frivolous. An action is frivolous where it is "clear under existing precedents that there is no chance of success and no reasonable argument to extend, modify or reverse the law as it stands." *Mareno v. Rowe*, 910 F.2d 1043, 1047 (2d Cir.), *cert. denied*, 498 U.S. 1028, 111 S.Ct. 681, 112 L.Ed.2d 673 (1991). This is not the situation here, where both actions have involved hotly contested, close questions of law

---

**6.** At trial, the *Allen* Plaintiffs presented evidence of specific benefits—such as a restricted stock plan—contained in some WestPoint plans that were not available under the EPI Program. Tr. 968. They suggested that the 5% discount rate may have been intended to compensate for such differences. However, there is absolutely no evidence that the inclusion of the 5% rate was anything other than a mistake. Moreover, it is not clear that the benefit plans available to WestPoint's executives were more generous than those provided to Cluett's executives; indeed, Roark, who worked for both companies, testified that the opposite was true. Tr. 1081, 1086.

**7.** Because it might well be the case that WestPoint did not intend for the attorneys' fee provi-

sion to apply to disputes with prior management, this result may seem unfair. However, the language of the provision is unambiguous, and the Court is not empowered to rewrite the terms of a contract. *See Breed v. Insurance Co. of North America*, 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 385 N.E.2d 1280 (1978) (court should not "vary" contract to "accomplish its notions of abstract justice or moral obligation"); *Moshiko, Inc. v. Seiger & Smith, Inc.*, 137 A.D.2d 170, 529 N.Y.S.2d 284, 288 (1st Dep't), *aff'd*, 72 N.Y.2d 945, 533 N.Y.S.2d 52, 529 N.E.2d 420 (1988) (court may not invent ambiguity where none exists).

and fact. Accordingly, Plaintiffs are entitled to attorneys' fees if their disputes arose "upon or after a change in control."

### 1. *Allen Plaintiffs*

 Under the EPI Amendment, a participant was not entitled to a lump sum payment unless and until a change in control actually occurred: "upon the occurrence of a Change in Control the Executive ... shall be paid in a lump sum a benefit equal to the Actuarial Equivalent of the Executive's ... Accrued Benefit...." EPI Amendment, Joint Ex. 18 at 3. Prior to a change in control, the *Allen* Plaintiffs had no right to any lump sum payment, and no legally cognizable dispute with WestPoint.

The subject of the *Allen* Plaintiffs' lawsuit is their right to a lump sum payout calculated using a 5% discount rate. Their dispute with WestPoint could not possibly have arisen until April 5, 1989, when the lump sums became due and they did not receive such a payout. The *Allen* Plaintiffs are therefore entitled to be compensated by WestPoint for their costs and attorneys' fees.[8]

### 2. *Krumme*

 Unlike the *Allen* Plaintiffs, Krumme began fighting with WestPoint management over his EPI benefits prior to the Farley takeover. He wrote letters asserting that his benefit should be calculated using a 5% discount rate, and brought suit against West-Point on March 24, 1989, approximately two weeks before a change in control occurred. Nonetheless, because Krumme's rights under the EPI Amendment could not have vested until April 5, 1989, his "dispute"—like that of the *Allen* Plaintiffs—could not have arisen until that time. WestPoint must therefore compensate Krumme for the costs and attorneys' fees he incurred in this suit.

### IV. *Conclusion*

For the foregoing reasons, I decline to rescind the releases executed by the *Allen*

Plaintiffs. Further, I find that both the *Allen* Plaintiffs and Krumme are entitled to have their attorneys' fees and costs paid by WestPoint.

SO ORDERED.

---

8. In actuality, most of the *Allen* Plaintiffs had no dispute with WestPoint until well after April 5, 1989. At trial, all but one of the *Allen* Plaintiffs testified that when they received their lump sum payouts, they believed they had been paid all to which they were entitled. Tr. 520–21, 570, 614, 648, 721, 847, 864, 880. Hence, their dispute did not really "arise" until the late summer of 1989, when Robert Krumme contacted them and encouraged them to file suit.