**Robert D. KRUMME, Plaintiff–Appellee,**

v.

**WESTPOINT STEVENS INC., f/k/a West Point–Pepperell, Inc., Defendant–Appellant.**

**Gordon E. Allen, John Currier, James J. Dunne, Leo Fornero, Gerard P. Mandry, Norman K. Matheson, Bruce E. Moore, Nicholas Pallotta and Cochran B. Supplee, Plaintiffs–Appellees,**

v.

**WestPoint Stevens Inc., formerly known as West Point–Pepperell, Inc., Defendant–Appellant.**

**Docket Nos. 99–9442, 99–9464.**

United States Court of Appeals, Second Circuit.

Argued Oct. 17, 2000.

Decided Dec. 28, 2000.

James W. Harbison, Jr., New York City, Robert D. Krumme, Concord, MA, (Carolyn W. Jaffe, Morgan, Lewis & Bockius, New York City, of counsel), for Appellee Krumme.

Robert A. Schwinger, New York City (Phoebe A. Wilkinson, Gretchen N. Werwaiss, Chadbourne & Parke LLP, New York City, of counsel; Robert D. Krumme, Concord, MA, of counsel; Robert J. Hausen, P.C., New York City, of counsel, on the brief), for Appellees Allen, et al.

Francis Carling, New York City (Collazo, Carling & Mish, New York City, Frederick A. Brodie, Eric T. Streck, Winthrop, Stimson, Putnam & Roberts, New York City, of counsel), for Appellant WestPoint Stevens.

Before MESKILL, NEWMAN and CABRANES, Circuit Judges.

MESKILL, Circuit Judge:

Appellant WestPoint Stevens Inc. (WestPoint) appeals from two judgments of the United States District Court for the Southern District of New York, Scheindlin, J., ordering WestPoint to pay attorney's fees, costs and interest in the amount of $4,800,460—$1,778,991 to plaintiff-appellee Robert D. Krumme (Krumme) and $3,021,469 to plaintiffs-appellees Gordon E. Allen, John E. Currier, James J. Dunne, Leo Fornero, Gerard P. Mandry, Norman K. Matheson, Bruce E. Moore, Nicholas Pallotta and Cochran B. Supplee (collectively the "*Allen* plaintiffs").

To resolve this appeal, we must determine (1) when a "dispute arises" to trigger a party's rights under a fee-shifting provision, and (2) whether a general release of a

party's obligations under a contract relieves that party of the obligation to pay attorney's fees pursuant to a provision in the same contract. The district court held that a dispute under the relevant provision can arise only when a party's rights vest under the contract and that a broad release does not relieve the releasee of the obligation to pay attorney's fees pursuant to the released contract. *See Allen v. WestPoint–Pepperell,* 933 F.Supp. 261, 269–70 (S.D.N.Y.1996). For the reasons that follow, we reverse.

## BACKGROUND

This appeal presents another chapter in a litigation that has spanned three decades. It involves dozens of plaintiffs in three separate actions before four district court judges, three panels of this Court and a New York state court. The full background is presented thoroughly in numerous district court opinions, as well as two prior opinions of this Court. *See Krumme v. WestPoint Stevens,* 143 F.3d 71 (2d Cir.1998); *Krumme v. West Point–Pepperell,* 22 F.Supp.2d 177 (S.D.N.Y. 1998); *Allen,* 933 F.Supp. at 261. We assume familiarity with those opinions and recount only the facts necessary to understand and resolve the present appeal.

1. *The EPI Program and the EPI Amendment*

The plaintiffs are ten former, senior executives of Cluett, Peabody & Company, Inc. (Cluett). Each participated in Cluett's Executive Permanent Insurance (EPI) Program. In 1986, WestPoint acquired Cluett and began administering the EPI Program. The EPI Program includes a deferred compensation agreement, under which participants who reach the age of 65 are entitled to receive lifetime monthly payments, on an annual basis, equal to 30 percent of their final base salary. Upon acquiring Cluett, WestPoint became the obligor with respect to plaintiffs' benefits under this agreement.

Confronted with the prospect of a hostile takeover, WestPoint drafted an amendment to the deferred compensation agreement (the "EPI Amendment"). The proposed EPI Amendment would allow participants to opt for a lump sum payment in the event of a change of control, rather than await monthly payments at age 65.[1] The board designed the EPI Amendment to protect the benefits of EPI Program participants from the potential actions of a hostile acquiror.

To further deter an acquiror from depriving the participants of their lump-sum payments, the EPI Amendment contained a broad fee-shifting provision. The fee-shifting provision required WestPoint to reimburse participants for their investigative costs and attorney's fees "[i]f at any time *upon or after* a Change of Control there should arise any dispute as to the validity, interpretation or application of any term [or] condition of this Agreement." (emphasis added). In the event that such a dispute arose, WestPoint agreed to reimburse the participants on a current basis whether or not they ultimately prevailed.

### 2. *The Start of Litigation and the Change of Control*

On October 24, 1988, Farley, Inc. (Farley) commenced a hostile tender offer for all outstanding shares of WestPoint's common stock. On or about November 11, 1988, WestPoint offered the EPI Amendment to the program participants. Krumme and each *Allen* plaintiff accepted.

Shortly thereafter, WestPoint discovered that the EPI Amendment mistakenly provided that a 5 percent discount rate be used in the calculation of the participants' lump sum payment. WestPoint had intended to use a floating rate calculated at 120 percent of the Pension Benefit Guaranty Corporation (PBGC) immediate inter-

est rate. At all relevant times, this floating rate was 9.3 percent. The relationship between the discount rate and the lump sum payment is inverse; the higher the discount rate, the less the EPI participant receives. As a result of the drafting error, the plaintiffs' lump sum payments would have been nearly twice the market-based present value of their EPI benefits and significantly higher than payments to participants in WestPoint's other benefit plans.

On February 16, 1989, the Plan Committee changed the 5 percent discount rate to the 9.3 percent discount rate. We subsequently determined that WestPoint acted properly in making this adjustment. *See Krumme*, 143 F.3d at 82–86.

By letters dated February 22, 1989, WestPoint notified Krumme and the *Allen* plaintiffs that it had adopted a new discount rate and requested that they execute an election form. The election form provided that Krumme and the *Allen* plaintiffs could either (1) execute a broad release of WestPoint and remain eligible for the lump sum payment at the 9.3 percent discount rate, or (2) rescind the EPI Amendment and return to the original deferred compensation agreement, providing for monthly payments at age 65. The releases stated, in pertinent part:

> I elect to have my deferred compensation benefit paid as a lump sum in the event of a change in control. I understand that the lump sum payment of the actuarial equivalent of my deferred compensation benefit will be in full satisfaction of all obligations of [WestPoint], as successor to Cluett, Peabody & Co., Inc., under the terms of my Deferred Compensation Agreement, and that in accepting a lump sum payment I shall thereby release [WestPoint] from all obligations under the Agreement.

---

1. A change of control occurs, *inter alia*, when "any individual, corporation, ... or other person ... is or becomes the Beneficial Owner of Securities of WestPoint representing twenty percent (20%) or more of the combined voting power of WestPoint's then outstanding securities." EPI Amendment § 4A.(1)(g).

The *Allen* plaintiffs executed the releases and remained eligible for a lump sum payment calculated with the 9.3 percent discount rate. Krumme did not return the election form.

In two letters dated February 21, 1989, and March 1, 1989, Krumme asserted that he and the other participants were entitled to lump sum payments calculated with the 5 percent discount rate. Krumme charged that WestPoint's change to the rate constituted gross self-dealing and manipulation. By letter dated March 8, 1989, Krumme claimed that a change of control from WestPoint to Farley had already taken place. He reasserted his claim to a lump sum payment calculated with the 5 percent discount rate, threatened legal action and demanded attorney's fees pursuant to the EPI Amendment. WestPoint disputed each of Krumme's claims and denied each of his demands.

On March 24, 1989, Krumme commenced a lawsuit charging WestPoint with breach of contract, fraudulent misrepresentation and gross negligence. He sought a money judgment against West-Point for the lump sum payment, plus interest, a declaratory judgment that the 5 percent discount rate applied, punitive damages and costs and fees pursuant to the EPI Amendment.

On April 5, 1989, Farley purchased 95 percent of WestPoint's common stock, consummating the October 24, 1988 tender offer. That day, WestPoint mailed lump sum payments to various employees who were entitled to benefits upon a change of control. The checks were accompanied by a form letter, which stated that by cashing the check, the recipients "acknowledge that the Company's obligation to make informal payments has been fully satisfied." Each of the *Allen* plaintiffs received payments calculated with the 9.3 percent discount rate and each cashed their checks without protest.

At the behest of Krumme, however, the *Allen* plaintiffs filed suit against WestPoint on June 6, 1990, alleging breach of con-

tract, breach of fiduciary duty and fraud. Like Krumme, who represented and continues to represent them, the *Allen* plaintiffs' claims arose out of WestPoint's change of the discount rate and its failure to pay upon an alleged, earlier change of control to Farley. In addition, the *Allen* plaintiffs sought equitable rescission of the releases on the bases of fraud and mutual mistake regarding the appropriate discount rate.

On August 3, 1990, WestPoint moved to dismiss the complaint in the *Allen* action, arguing that the *Allen* plaintiffs had released WestPoint from liability on all of their claims. On January 25, 1991, the district court, Conboy, *J.,* dismissed the complaint in its entirety. On September 11, 1991, we held that the complaint sufficiently alleged the elements of rescission under New York law and we remanded for further proceedings. *See Allen v. West-Point–Pepperell,* 945 F.2d 40, 44–45 (2d Cir.1991), *rev'g* 1991 WL 8505 (S.D.N.Y. Jan.25, 1991). On remand, WestPoint filed its answer and raised a number of affirmative defenses, again contending that the *Allen* plaintiffs' claims were barred by the releases.

3. *Relevant District Court Determinations and Appeal*

In 1996, after five years of discovery disputes, cross-motions for partial summary judgment and bench trials on a number of discrete issues, the district court, Scheindlin, *J.,* reached the following conclusions:

(1) the change of control had occurred on April 5, 1989 when Farley purchased 95 percent of WestPoint's common stock. Therefore, WestPoint had made timely lump sum payments to the *Allen* plaintiffs under the EPI Amendment;

(2) the *Allen* plaintiffs were not entitled to rescind the releases on the basis of mutual mistake or fraud. Because the releases "amended and superseded" the EPI Amendment, the *Allen* plaintiffs'

lump sum payments were properly calculated using the 9.3 percent discount rate;

(3) Krumme was entitled to a lump-sum payment calculated using the 5 percent discount rate because WestPoint had violated ERISA when it adjusted the discount rate; and

(4) Krumme and the *Allen* plaintiffs were entitled to attorney's fees and costs pursuant to Section 16 of the EPI Amendment because their respective disputes with WestPoint had arisen "upon or after" the April 5, 1989 change of control.

The parties challenged numerous aspects of the district court's decision on cross-appeals, which we consolidated by Order dated April 17, 1997. On appeal, we concluded that WestPoint had not violated ERISA by adopting the 9.3 percent discount rate. *See Krumme*, 143 F.3d at 88. Accordingly, we affirmed the district court's decision in the *Allen* case and vacated its decision in the *Krumme* case. With respect to both actions, however, we "conclude[d] that we have no jurisdiction to review the district court's award of attorney's fees and costs [to Krumme and the *Allen* plaintiffs] until the amount of those fees and costs have been set." *Id.* We remanded for that determination.

4. *Subsequent District Court Proceedings*

On remand, WestPoint reiterated one of the arguments that we declined to reach on appeal, *i.e.*, that the district court's attorney's fees award was inconsistent with its decision to enforce the *Allen* releases, which "amended and superseded" the EPI Amendment. WestPoint sought permission to move for summary judgment on the grounds that the releases barred the *Allen* plaintiffs' claim for attorney's fees. The district court concluded that "it is too late to now raise a dispositive argument which could have and should have been raised earlier."

The district court then referred the case to a magistrate judge for calculation of the amount of fees, costs and interests owed

by WestPoint to the plaintiffs. Plaintiffs' entitlement to these awards and the amounts awarded are the subject of the present appeal.

## DISCUSSION

WestPoint raises numerous arguments on appeal, two of which were raised, but not addressed, in its previous appeal. First, WestPoint argues that Krumme and the *Allen* plaintiffs are not entitled to recover attorney's fees because their disputes with WestPoint arose before the April 5, 1989 change of control. Second, WestPoint argues that the *Allen* plaintiffs are barred by the releases from collecting fees or costs pursuant to the EPI Amendment.

In the event that it does not prevail on those arguments, WestPoint raises numerous challenges to the nature and amount of the fees, costs and interest awarded by the district court. We do not reach these additional arguments. Rather, we hold that Krumme is not entitled to recover attorney's fees under the EPI Amendment because his dispute with WestPoint did not arise "upon or after" April 5, 1989. With respect to the *Allen* plaintiffs, we hold that the releases extinguished WestPoint's obligations under the fee-shifting provision.

1. *Principles of Contract Interpretation*

Before turning to the parties' arguments, we outline the general principles of contract interpretation that guide our determinations.

The parties' briefs assume that New York law controls, and such "implied consent . . . is sufficient to establish choice of law." *Tehran–Berkeley Civil & Environmental Engineers v. Tippetts–Abbett–McCarthy–Stratton*, 888 F.2d 239, 242 (2d Cir.1989). It is well settled that "[t]he threshold question in a dispute over the meaning of a contract is whether the contract terms are ambiguous." *Revson v. Cinque & Cinque, P.C.*, 221 F.3d 59, 66 (2d Cir.2000) (applying New York law). The

language of a contract is ambiguous if it is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." *Seiden Assocs. v. ANC Holdings*, 959 F.2d 425, 428 (2d Cir.1992) (quotation marks omitted). Conversely, a contract is unambiguous when it has " 'a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.' " *Hunt Ltd. v. Lifschultz Fast Freight*, 889 F.2d 1274, 1277 (2d Cir.1989) (quoting *Breed v. Insurance Co. of North America*, 46 N.Y.2d 351, 355, 413 N.Y.S.2d 352, 355, 385 N.E.2d 1280, 1282 (1978)). We "review the district court's conclusion regarding whether a contract is clear or ambiguous *de novo*." *Tourangeau v. Uniroyal*, 101 F.3d 300, 306 (2d Cir.1996) (citing *Seiden*, 959 F.2d at 429).

▊ Where "the parties' intent is unambiguously conveyed by the plain meaning of the agreements, then interpretation is a matter of law," *Crane Co. v. Coltec Indus.*, 171 F.3d 733, 737 (2d Cir.1999) (internal quotation marks omitted) (applying New York law), and we will review that interpretation *de novo*. *See, e.g., K. Bell & Assocs. v. Lloyd's Underwriters*, 97 F.3d 632, 637 (2d Cir.1996) (applying New York law). When interpreting an unambiguous contract, "[w]ords and phrases are given their plain meaning." *PaineWebber v. Bybyk*, 81 F.3d 1193, 1199 (2d Cir.1996) (quotation marks omitted) (applying New York law). Under New York law, therefore, a court must enforce that plain meaning, "[r]ather than rewrite an unambiguous agreement." *American Express Bank Ltd. v. Uniroyal*, 164 A.D.2d 275, 277, 562 N.Y.S.2d 613, 614 (1st Dep't 1990) ("*American Express*"); *see also Heller v. Pope*, 250 N.Y. 132, 135, 164 N.E. 881, 882 (1928).

It is within this general framework that we examine the district court's interpretations of the fee-shifting provision and the *Allen* releases.

2. *Fee–Shifting Provision: "Upon or After a Change of Control"*

The fee-shifting provision states, *inter alia*, that "[i]f at any time upon or after a Change of Control there should arise any dispute as to the validity, interpretation or application of any term" of the deferred compensation agreement, West-Point must pay certain costs and fees to the participants on a current basis. After examination, the district court held that "the language of the [fee-shifting] provision is unambiguous." *Allen*, 933 F.Supp. at 269 n. 7. We agree. The fee-shifting provision, although broad, is "definite and precise" and "there is no reasonable basis for a difference of opinion" as to its meaning. *Hunt Ltd.*, 889 F.2d at 1277 (quotation marks omitted).

The plaintiffs' attempt to recast the fee-shifting provision as ambiguous and characterize the district court's determination of when a dispute arose as factual is unpersuasive. Essentially, we are presented with two legal applications of an unambiguous contract. *Given the factual findings of the district court* with regard to the parties' interactions, we must determine whether a dispute had arisen before or "upon or after" the change of control, within the meaning of the fee-shifting provision. This is a pure legal question which we now proceed to answer unencumbered by the deference generally accorded to the district court on a factual determination.

▊ The district court held that a "dispute" had not arisen between the parties prior to the change of control because the plaintiffs' right to a lump sum payment had not yet vested. *See Allen*, 933 F.Supp. at 270. In other words, the district court held that no "dispute" could have "arisen" between plan participants and WestPoint until the April 5 change of control because that was when the participants' rights to a lump sum payment vested.

However, the district court's "vested rights" interpretation of the fee-shifting provision is doubly flawed. First, it renders the words "upon or after a Change of Control" superfluous—if disputes arise only when rights vest, and if rights vest only upon or after a change of control, there is no reason to specify that attorney's fees are available only for those disputes that arise upon or after a change of control *because that is when all disputes arise.* Second, on its dictionary definition, discussed below, a dispute is a conflict or controversy—not just a conflict or controversy *over vested rights.* Accordingly, the district court's interpretation impermissibly narrows the scope of the fee-shifting provision by construing the provision's reference to a "dispute" as a reference to a dispute over vested rights. *See generally American Express,* 164 A.D.2d at 277, 562 N.Y.S.2d at 614 (noting that courts must not "rewrite an unambiguous agreement").

The district court's interpretation distorts the plain meaning of the fee-shifting provision, thereby "rewrit[ing] an unambiguous agreement." *American Express,* 164 A.D.2d at 277, 562 N.Y.S.2d at 614. Here, the "words and phrases used by the parties must, as in all cases involving contract interpretation, be given their plain meaning, and the plain meaning of the words used by the parties to this contract do not manifest an intention" to elevate the ordinary meaning of the term "dispute" to a stringent vested rights analysis. *Brooke Group Ltd. v. JCH Syndicate 488,* 87 N.Y.2d 530, 534, 640 N.Y.S.2d 479, 482, 663 N.E.2d 635, 638 (1996) (internal citation omitted).

A dispute is defined as a "conflict or controversy," "an assertion of a right, claim, or demand on one side, met by contrary claims or allegations on the other," or "the subject of litigation." *Black's Law Dictionary* 472 (6th ed. unabridged 1990). A circumstance (such as a dispute) "arises" when it "spring[s] up, originate[s], ... [or] come[s] into being." *Id.* at 108. Similarly, Webster's defines a "dispute" as a "verbal controversy," "strife by opposing argument or expression of opposing views or claims," or a "quarrel." *Webster's Third New International Dictionary* 655 (3d ed.1993). A dispute "arises" when it "comes about" or "takes place." *See id.* at 117. Therefore, if a conflict, controversy or competing assertion of rights took place between WestPoint and the plaintiffs prior to the April 5, 1989 change of control, the plaintiffs are not entitled to recover attorneys' fees under the fee-shifting provision.

The district court's findings and the undisputed evidence in the record indicate that a dispute had arisen between Krumme and WestPoint prior to the change of control date. The district court found that Krumme had been "fighting with WestPoint management over his EPI benefits" prior to April 5, 1989. Krumme wrote two "letters of protest" to WestPoint "asserting" that 5 percent was the proper discount rate and that a change of control had already occurred. In a third letter "Krumme threatened to take legal action against WestPoint," which action he commenced on March 24, 1989. All of this occurred well in advance of the change in control date, as determined by the district court. The district court's factual findings fit comfortably within the common definitions of a "dispute" set forth above.

In conclusion, we hold that the district court's findings—that Krumme and WestPoint began "fighting," that Krumme had repeatedly asserted rights under the EPI Amendment, that WestPoint contested Krumme's claims, and that Krumme threatened and eventually commenced a lawsuit against WestPoint—constitute a dispute under the EPI Amendment. Because that dispute arose prior to the change of control, Krumme is not entitled to recover attorney's fees under the EPI Amendment.

We need not determine whether the *Allen* plaintiffs' dispute "ar[o]se upon or after a Change of Control" because, for the reasons discussed below, we hold that the *Allen* plaintiffs released WestPoint from

its obligations under the fee-shifting provision. However, we note that the *Allen* case presents a factually distinct scenario from Krumme. The *Allen* plaintiffs did not file suit until over a year after the change of control and, unlike in *Krumme,* the district court did not expressly find that the *Allen* plaintiffs had begun "fighting" with WestPoint over their entitlement to benefits. Our holding that when a "dispute arises" is not necessarily coterminous with when rights vest under a contract is based on the facts in the *Krumme* case and should not be extended to the same issue in the *Allen* case, which we do not reach.

### 3. *The* Allen *Releases*

In late February 1989, the *Allen* plaintiffs each signed releases stating, *inter alia,* that "the lump sum payment of the actuarial equivalent of my deferred compensation benefit will be in full satisfaction of all obligations of [WestPoint] ... and that in accepting a lump sum payment I shall thereby release [WestPoint] from all obligations under the Agreement." Approximately two months later, each of the *Allen* plaintiffs accepted lump sum payments.

In their lawsuit, the *Allen* plaintiffs sought rescission of these seemingly broad releases on the grounds of mutual mistake and fraud arising out of WestPoint's change to the discount rate. The district court held that the alleged mistake did "not justify" the "drastic and extraordinary remedy" of rescission. *Allen,* 933 F.Supp. at 268 (internal quotation marks omitted). The district court further held that the *Allen* plaintiffs released "WestPoint from any further obligation to them" and that the releases "amended and superseded their EPI Amendments." *Id.* Nevertheless, without explanation, the district court held that the *Allen* plaintiffs were entitled to recover attorney's fees pursuant to the very same EPI Amendment.

After we declined to hear any attorney's fees issues on appeal, WestPoint argued on remand that the district court's decision was internally inconsistent and that it had erred by failing to hold that the broad and unambiguous releases encompassed the fee-shifting provision. The district court held that because WestPoint had failed to raise the defense prior to its appeal to this Court in 1997, it would be "totally inappropriate for the Court to now permit WestPoint to take a second bite of the apple." In effect, the district court found that WestPoint had forfeited its defense by failing to raise it in a timely manner.

### A. *Forfeiture of the Release Defense*

The parties approach this issue from a number of different angles. WestPoint argues in its opening brief that it did not waive the release defense as to attorney's fees and that, in any case, this Court should exercise its discretion to hear this issue because it is a pure question of law and injustice would result by leaving untouched an internally inconsistent district court opinion. In response, the *Allen* plaintiffs argue that (1) WestPoint should not be permitted to raise an issue for the first time on appeal because it will prejudice the *Allen* plaintiffs and reward WestPoint's bad faith tactics, and (2) the district court correctly found that WestPoint forfeited the defense.

■ As an initial matter, this issue is properly framed as one relating to forfeiture, not waiver. Unlike a waiver, which is an "intentional relinquishment of a known right," a forfeiture occurs "[w]here a litigant's action or inaction is deemed to incur the consequence of loss of a right, or, as here, a defense." *Hamilton v. Atlas Turner, Inc.,* 197 F.3d 58, 61 (2d Cir.1999). However, because we choose to exercise our discretion to reach this issue whether or not it was raised below, we do not address whether the district court abused it discretion in finding a forfeiture. *See Diesel v. Town of Lewisboro,* 232 F.3d 92, 2000 WL 1692912, at *14 (2d Cir. Nov. 9, 2000) (recognizing that "we have discretion

to address the merits of an otherwise waived argument").

■ "It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below." *Singleton v. Wulff*, 428 U.S. 106, 120, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976); *see also Vintero Corp. v. Corporacion Venezolana de Fomento*, 675 F.2d 513, 515 (2d Cir. 1982) ("A party who has not raised an issue below is precluded from raising it for the first time on appeal.") (internal quotation marks omitted). In *Singleton*, the Supreme Court explained the rule's rationale:

> [The rule] is essential in order that parties may have the opportunity to offer all the evidence they believe relevant to the issues ... [and] in order that litigants may not be surprised on appeal by final decision there of issues upon which they have had no opportunity to introduce evidence.

428 U.S. at 120, 96 S.Ct. 2868 (quoting *Hormel v. Helvering*, 312 U.S. 552, 556, 61 S.Ct. 719, 85 L.Ed. 1037 (1941)).

■ In keeping with this rationale, we have repeatedly recognized that the rule is not an absolute bar "where the issue is purely legal and there is no need for additional fact-finding" or "where consideration of the issue is necessary to avoid manifest injustice." *Readco, Inc. v. Marine Midland Bank*, 81 F.3d 295, 302 (2d Cir.1996); *see also Greene v. United States*, 13 F.3d 577, 586 (2d Cir.1994). *Cf. Diesel*, 232 F.3d at 108 (refusing to exercise discretion "where the argument requires new evidence or factual findings") (internal quotation marks omitted). Therefore, where an allegedly forfeited claim raises "a pure question of law," we may choose to reach the merits. *Baker v. Dorfman*, 2000 WL 1233349, *4 (2d Cir. Sept. 1, 2000).

WestPoint has easily met this standard. The facts underlying the scope of the releases have been fully set out during a decade of litigation. Whether the releases, the scope and effect of which are unambig-uous, relieve WestPoint's obligation to pay attorney's fees under the EPI Amendment is purely a question of law. *See Revson*, 221 F.3d at 65 ("Under New York law, the meaning of a contract that is unambiguous is a question of law for the court to decide."). The *Allen* plaintiffs argue that they will be prejudiced if we exercise our discretion to hear this issue. In particular, they contend that the district court's equitable decision not to rescind the releases would have come out differently if the district court had known that the *Allen* plaintiffs would not recover attorney's fees.

■ A court will refuse to consider a forfeited defense where there may have been "particular facts that might have been better developed and analyzed if the issue had been raised below" or where "[t]here is a risk of prejudice to the other party." *Amcel Corp. v. International Executive Sales*, 170 F.3d 32, 36 (1st Cir. 1999). Here, however, the *Allen* plaintiffs' claim of prejudice is belied by the district court's opinion, severely compromised by our 1998 decision and is not supported by New York law. For these reasons, we are not swayed by the *Allen* plaintiffs' speculation.

First, there is no indication that the district court considered attorney's fees in rejecting the *Allen* plaintiffs' rescission claim. The district court held that (1) although WestPoint improperly changed the mistaken discount rate, it had acted in good faith (in fact, as discussed below, WestPoint did not act improperly), (2) WestPoint should not be compelled to pay twice the market-based value of the *Allen* plaintiffs' benefits, and (3) each of the *Allen* plaintiffs had received a fair payment. The district court concluded that rescission "would create an entirely unfair result" and "provide the Allen plaintiffs with an undeserved and unintended windfall." *Allen*, 933 F.Supp. at 269. In the next section of its opinion, the district court addressed attorney's fees without a single reference back to the rescission determination.

Second, our 1998 decision severely undercuts any remaining likelihood that the *Allen* plaintiffs could have been entitled to rescission of the releases. In their lawsuit, the *Allen* plaintiffs sought rescission on the grounds of mutual mistake and fraud arising out of WestPoint's change to the discount rate. The district court held that *although WestPoint improperly changed the discount rate*, the equities did "not justify ... [the] drastic and extraordinary remedy" of rescission. *Id.* at 268 (internal quotation marks omitted). On appeal, we held that, in fact, WestPoint had *properly* changed the discount rate. However, "[b]ecause the Allen plaintiffs' rescission and fraud claims both were predicated on the theory that 5% represented the proper discount rate at which to calculate their lump sum payouts under the EPI Amendment, we affirm[ed] the district court's judgment [denying rescission] on the merits without reaching [those] claims." *Krumme*, 143 F.3d at 82–83. Our ruling swept away the foundation for any subsequent rescission claim by the *Allen* plaintiffs.

Finally, while the *Allen* plaintiffs correctly note that rescission is an equitable determination, their assertion that attorney's fees somehow are involved in that analysis is unsupported. They have not cited any New York case law to support the proposition that the district court could have properly considered attorney's fees. Under New York law, "[r]escission is an extraordinary remedy, appropriate only where the breach is found to be material and willful, or, if not willful, so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract." *Canfield v. Reynolds*, 631 F.2d 169, 178 (2d Cir.1980) (internal quotation marks omitted). We are not convinced that New York law would permit the consideration of attorney's fees to tip the equitable balance in favor of the plaintiffs where the trial court found that the defendant acted in good faith and that the plaintiffs received fair payment under the agreement.

Accordingly, we find that WestPoint presents a pure question of law, the determination of which requires no additional fact-finding and does not prejudice the *Allen* plaintiffs. At bottom, however, "[e]ntertaining issues raised for the first time on appeal is discretionary with the panel." *Greene*, 13 F.3d at 586. In exercising our discretion to hear WestPoint's defense, assuming, *arguendo*, that it was not properly raised below, we have considered three additional factors. First, the district court's holding that the *Allen* plaintiffs "released WestPoint from any further obligation to" them under the EPI Agreement, is facially inconsistent with the district court's holding that the *Allen* plaintiffs were entitled to attorney's fees under the same agreement. The *Allen* plaintiffs have failed to harmonize these two conclusions and the district court declined the opportunity to do so. This inconsistency, although it may not rise to the level of manifest injustice as WestPoint argues, certainly weighs in favor of our reaching the issue.

Second, we find the district court's forfeiture determination dubious at best. WestPoint consistently and aggressively advanced the releases as a defense to plaintiffs' entire claim for breach of the EPI Amendment. From the outset, WestPoint pressed the argument that the releases barred the *Allen* plaintiffs from recovering anything under the EPI Amendment. In 1990, the district court granted WestPoint's motion to dismiss on the basis of the release defense. After we reversed that decision, WestPoint again raised the affirmative defense of the releases in its answer.

Since then, the threshold dispute between WestPoint and the *Allen* plaintiffs has been whether the *Allen* plaintiffs were entitled to rescind the releases. In 1995, WestPoint moved for partial summary judgment arguing that the plaintiffs released WestPoint from "all obligations under EPI." The district court denied partial

summary judgment for WestPoint because it found that there were factual issues regarding the *Allen* plaintiffs' rescission claim. To that end, in January 1996, the district court held a separate trial on the issue of whether the releases should be rescinded.

Prior to the trial, the parties repeatedly cited the importance of the release issue to the *Allen* plaintiffs' claims. For example, WestPoint's counsel argued at a 1995 conference that if the *Allen* plaintiffs "don't get around the release, they don't get anywhere." Judge Scheindlin concurred, noting that "if the releases are good, they haven't breached anything." Finally, before the parties agreed to try the change of control issue separately, WestPoint's counsel noted that *"subject to certain argument about the release,"* the change of control issue was likely dispositive of the attorney's fees issue.

WestPoint argues that it was inconceivable that the district court could find that the releases "superseded" the EPI Amendment, and nevertheless award attorney's fees under the EPI Amendment. The district court responded that West-Point should have anticipated that it would prevail on the rescission issue and raised the release as a defense to attorney's fees. This begs the question. Litigating the rescission issue *was* raising the attorney's fees defense because if the district court had uniformly applied its interpretation of the releases, WestPoint's attorney's fees argument not only would have been addressed, but would have prevailed. Notably, WestPoint points out that when the *Allen* plaintiffs appealed the dismissal of their complaint in 1991, they did not argue that, even if the releases were upheld, they still should be entitled to attorney's fees.

In the past, we have noted that "a party cannot be expected to anticipate every aspect of [a ruling] that may be subject to profitable challenge on appeal." *Chase Manhattan Bank, N.A. v. American Nat'l Bank & Trust Co.,* 93 F.3d 1064, 1072 (2d Cir.1996); *see also Kepner–Tregoe, Inc. v.*

*Vroom,* 186 F.3d 283, 289 (2d Cir.1999) (defendant "cannot be said to have reasonably anticipated that the lower court would make an allegedly double damage award"). In that vein, we refuse to require a defendant to anticipate that a trial court will issue an internally inconsistent decision.

Finally, although the *Allen* plaintiffs allege that WestPoint made a "deliberate tactical decision" not to raise the release as a defense to attorney's fees, the district court did not find any evidence that West-Point made such a decision, *see Krumme v. West Point–Pepperell,* 1998 WL 526430, at *2–3 (S.D.N.Y. Aug.20, 1998), and we find none in the record.

The district court noted that "if West-Point is right, then this issue can and will be decided as a matter of law and need cause no further expense and delay by permitting a new round of motion practice in the district court." *Id.* at *3 n. 5. WestPoint is right, and we accept the district court's invitation to review this issue as a matter of law.

### B. *Scope of Releases*

■ Previously we affirmed the district court's finding that the releases are broad and unambiguous. *See Allen,* 945 F.2d at 44. They purport to relieve West-Point of all obligations under the deferred compensation agreement, as amended by the EPI Amendment. The district court did not provide any rationale for its implicit finding that the releases did not encompass WestPoint's obligations under the fee-shifting provision. In any event, like any other contract, we review *de novo* the scope of an unambiguous release. *See Tourangeau,* 101 F.3d at 306; *Spector v. Sovereign Const. Co.,* 45 A.D.2d 673, 673, 356 N.Y.S.2d 79, 80 (1st Dep't 1974) (per curiam).

■ An unambiguous release "should be enforced according to its terms." *Booth v. 3669 Delaware,* 92 N.Y.2d 934, 935, 680 N.Y.S.2d 899, 900, 703 N.E.2d 757, 758 (1998); *see also Mangini*

*v. McClurg,* 24 N.Y.2d 556, 562, 301 N.Y.S.2d 508, 512–13, 249 N.E.2d 386, 390 (1969). Under New York law, a broad release of contractual obligations includes the obligation to pay attorney's fees unless attorney's fees are expressly carved out of the release. *See, e.g., 815 Park Avenue Owners v. Metzger,* 250 A.D.2d 471, 471–72, 672 N.Y.S.2d 860, 861 (1st Dep't 1998) (recovery of attorney's fees expressly excepted in release). *Cf. Valley Disposal v. Central Vermont Solid Waste Management Dist.,* 71 F.3d 1053, 1058 (2d Cir. 1995) (in section 1983 context, holding that "a party may express its intent to waive attorneys' fees by employing broad release language, regardless of whether that release explicitly mentions attorneys' fees"). The releases contain no express carve-out of any provision of the agreement. Accordingly, we hold that the releases extinguish WestPoint's obligation to pay attorney's fees under the EPI Amendment.

The *Allen* plaintiffs do not dispute the broad scope of the February 22, 1989 releases. Nor could they. Instead, the *Allen* plaintiffs argue that the April 5, 1989 cover letter which accompanied the lump sum payments limited the scope of the releases to "the Company's obligation to make informal payments." This argument is baseless.

The April 5, 1989 form letter was sent to participants in various benefit programs administered by WestPoint and does not contain a single reference to the *Allen* releases. Therefore, it cannot be deemed to supersede or modify the broad and unambiguous February 22, 1989 releases. *See Goldberg v. Manufacturers Life Ins. Co.,* 242 A.D.2d 175, 181, 672 N.Y.S.2d 39, 44 (1st Dep't 1998); *Teitelbaum Holdings v. Gold,* 48 N.Y.2d 51, 56, 421 N.Y.S.2d 556, 559, 396 N.E.2d 1029, 1032 (1979) ("[M]atters extrinsic to the agreement may not be considered when the intent of the parties can be gleaned from the face of the instrument.").

## CONCLUSION

For the foregoing reasons, we reverse the district court's judgments awarding attorney's fees, costs and interest to Krumme and the *Allen* plaintiffs.

The parties shall bear their own appellate costs.